

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 07 2010

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**HARVEY BEECH**                                                **PLAINTIFF**

**VS.**                    **CASE NO.** 4·10-CV-0 54 7DPM

This case assigned to District Judge Marshall
and to Magistrate Judge Deere

**SELECT PORTFOLIO SERVICES (sic);**
**WELLS FARGO BANK, N.A AS TRUSTEE FOR THE**
**HOLDERS OF THE FIRST FRANKLIN MORTGAGE LOAN**
**TRUST 2006-FF15 MORTGAGE PASS-THROUGH**
**CERTIFICATES, SERIES 2006-FF15;**
**SHAPIRO and KIRSH, LLP; (sic)**                              **DEFENDANTS**

### NOTICE OF REMOVAL

Defendant Select Portfolio Servicing, Inc. [1] ("SPS") (incorrectly named as Select

Portfolio Services in plaintiff Harvey Beech's complaint (the "Complaint")), by and through its

undersigned attorneys, pursuant to 28 U.S.C. §§1441 and 1332, states as follows:

1.      Plaintiff Harvey Beech ("Beech") commenced an action in the Circuit Court of

Lonoke County, Arkansas, Third Division, entitled *Harvey Beech v. Select Portfolio Services*

*(sic); Wells Fargo Bank, N.A as trustee for the holders of the First Franklin Mortgage Loan*

*Trust 2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15; Shapiro and Kirsh,*

*LLP;* (sic), Case No. CV-2010-428.

2.      In the Complaint, Beech alleges he is an individual residing in Lonoke County,

Arkansas.

---

[1] Wells Fargo Bank, National Association, as trustee for the holders of the First Franklin Mortgage Loan Trust
2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15 ("Trustee") is not aware of service of process
upon it by Beech. Wright, Lindsey & Jennings LLP intends to represent Trustee in this matter if and when
Trustee is served with process. If Trustee has been served with process as of the filing of this notice of removal,
it joins in and consents to removal of this matter to federal court and specifically reserves all rights and defenses,
including those based on insufficiency of process and insufficiency of service of process.

3.     SPS is a foreign corporation organized and existing under the laws of the State of Delaware with its principal place of business in Salt Lake City, Utah, as admitted by Beech.

4.     Wells Fargo Bank, National Association, as trustee for the holders of the First Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15 ("Trustee") is a national banking association chartered and headquartered in Sioux Falls, South Dakota.

5.     Shapiro & Kirsch, LLP (incorrectly named in the Beech filing as Shapiro and Kirsh, LLP) is a limited liability partnership organized and existing under the laws of the State of Tennessee.

6.     This Notice of Removal is filed within thirty (30) days of delivery of a copy of the Complaint to SPS by certified mail.  Copies of a summons and the Complaint with exhibits are attached hereto as **Exhibit 1**, and constitute all the known process, pleadings and orders that have been delivered to SPS by Beech.  Process and service of process are improper as to SPS and failure to comply with the procedural rules is specifically reserved and not waived by removal.

7.     This civil action is removable pursuant to the provisions of 28 U.S.C. §1441 because none of the parties joined and served as defendants is a citizen of the State of Arkansas where plaintiff resides.

8.     This Court has original jurisdiction over this civil action under 28 U.S.C. §1332 because it is between citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1441(a) because the United States District Court for the Eastern District of Arkansas, Little Rock Division, embraces the Circuit Court of Lonoke County, Arkansas, where this action was first filed. SPS, however, reserves the right to file a motion to transfer this case to another venue if appropriate pursuant to 28 U.S.C. § 1404(a), and does not waive its right to do so.

10.     Pursuant to 28 U.S.C. §1446(d), SPS will give notice of the filing of this Notice of Removal to plaintiff and will file a copy of this notice with the Clerk of the state court in which this action was originally filed.

11.     The defendants are neither incorporated in the State of Arkansas nor have their principal places of business and/or residences in the State of Arkansas.  There is, therefore, complete diversity between plaintiffs and defendants under 28 U.S.C. § 1332(c)(1).

12.     Plaintiff seeks an order directing the defendants to "cease and desist foreclosure actions and collection attempts" (*see* Complaint at p. 9) in an attempt to avoid foreclosure of his interest in real property and the sale of the real property upon foreclosure, the proceeds of which sale would be applied to plaintiff's debt to Trustee.  In other words, plaintiff seeks to protect his claim of right of ownership in the real property and to avoid repayment of his debt to Trustee.

13.     The mortgage of Trustee on plaintiff's residence secures a promissory note with an original face value of $188,000.00.  The county assessor's appraised value of the residence in 2009 was more than $200,000.00.

14.     Thus, based on the Complaint and the assessed value of the real property at issue, the amount in controversy exceeds $75,000.00.

15.     Although Beech has sent copies of a summons and the Complaint to SPS by certified mail, Beech has not properly served SPS with proper process.

16.     The summons sent by Beech to SPS is directed to "Select Portfolio Services," which is not SPS.  SPS's name is Select Portfolio Sevicing, Inc.  *See* Exhibit 1.  Process was therefore insufficient.

17.     Service of process upon SPS was also insufficient because the certified mail sent by Beech did not conform to the service of process requirements of Ark. R. Civ. P. 4.  The certified mail was addressed to:

> Select Portfolio Services
> Corporate Service Co.
> 300 Spring St. Suite 900
> Little Rock, AR 72201

*See* certified mailing envelope, attached hereto as **Exhibit 2**.

18.     Rule 4(d)(8)(A)(i) requires that service of process directly upon a corporation or other organization by mail must be addressed to a natural person specified by name.  "Select Portfolio Services Corporate Service Co." is not the name of SPS and is not a natural person.  Further, 300 Spring St. Suite 900, Little Rock, AR 72201 is not SPS's address.

19.     Rule 4(d)(8)(A)(i) provides that service on the registered agent of a corporation or other organization may be made by certified mail with a return receipt requested.  Although 300 Spring St., Suite 900, Little Rock, AR 72201 is the address of SPS's registered agent for service of process in Arkansas, "Select Portfolio Services Corporate Service Co." is not SPS's agent for service.

20.     Shapiro & Kirsch, LLP consents to removal of this action to federal court.  *See* correspondence from counsel for Shapiro & Kirsch, LLP, attached hereto as **Exhibit 3**.

21.    Trustee has not been "notified of the action, and brought under a court's authority, by formal process," and thus needs not consent to this removal. *Marano Enterprises of Kansas v. Z-Teca Restaurants, L.P. et al.*, 254 F.3d 753, 757 (8th Cir. 2001).

22.    The undersigned states that this removal is well grounded in fact and is warranted by existing law, and is not interposed for an improper purpose.

WHEREFORE, Select Portfolio Servicing, Inc. removes the state court action from the Circuit Court of Lonoke County, Arkansas to this Court, and prays that this Court take jurisdiction of this civil action to the exclusion of any further proceedings in the state court.

Respectfully submitted:

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL:  jhenry@wlj.com
         ajung@wlj.com

By  _Judy J. Henry_____
    Judy Simmons Henry (84069)
    Adrienne L. Jung (2007159)
    Attorneys for Select Portfolio Servicing, Inc.[1]

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2010, a copy of the foregoing was sent by United States

mail to the following:

Harvey Beech
121 Deer Creek Drive
Cabot, AR  72023

Don A. Eilbott
2800 Cantrell Road, Suite 500
Post Office Box 23870
Little Rock, AR 72221-3870

Judy Simmons Henry

## IN THE CIRCUIT COURT OF LONOKE COUNTY, ARKANSAS
## SUMMONS

**PLAINTIFF:HARVEY BEECH**
(If not represented by an
attorney, give address)_____

**Vs. No.: CV-2010-428**

**DEFENDANT: SELECT PORTFOLIO SERVICES; WELLS FARGO BANK NA AS TRUSTEE FOR THE HOLDERS OF THE FIRST FRANKLIN MORTGAGE LOAN TRUST 2006-FF15 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-FF15; SHAPIRO & KIRSCH LLP**

Plaintiff's attorney: PRO SE

**THE STATE OF ARKANSAS TO DEFENDANT:SELECT PORTFOLIO SERVICES**

### NOTICE

1. You are hereby notified that a lawsuit has been filed against you; the relief asked in the attached complaint.

2. The attached complaint will be considered admitted by you and a judgment by default may be entered against you for the relief asked in the complaint unless you file a pleading and thereafter appear and present your defense. Your pleading or answer must meet the following requirements:

    A. It must be in writing, and otherwise comply with the Arkansas Rules of Civil Procedure.

    B. It must be filed in the Court Clerk's office within 30 (THIRTY) days from the day you were served with the summons.

3. If you desire to be represented by an attorney you should immediately contact your attorney so that an answer can be filed for you within the time allowed.

    Additional Notices:

    WITNESS my hand and seal of the court this MAY 21 , 2010.

County Courthouse
P.O. Box 219
Lonoke, AR 72086-0219

**(SEAL)**

**DEBORAH OGLESBY, Clerk**
By:_____

Received for service this_____ day of_____, 200__, at_____ M.
_____ Sheriff:
By:_____
STATE OF ARKANSAS, COUNTY OF LONOKE:
On this_____ day of_____, 201__at_____o'clock___M., I have duly served the within summons by delivering a copy thereof (for stating the substance thereof), together with a copy of the complaint, to _____, such person being:

CHECK WHERE APPLICABLE:
_____The person named therein as defendant.
_____A member of the defendant's family, above the age of 14 years of age at the defendant's usual place of abode, namely_____
_____The duly designated agent for service of process for the defendant, namely_____.
_____OTHER:

                                                         **SHERIFF**
                                       By:_____



IN THE CIRCUIT COURT OF LONOKE COUNTY, ARKANSAS FILED
_____ DIVISION

2010 MAY 21  AM 10: 23

DEBORAH OGLESBY
LONOKE CO CIRCUIT CLERK

**HARVEY BEECH**

PLAINTIFF

**VS.**                         CASE NO.: CV2010-428

**SELECT PORTFOLIO SERVICES;**
**WELLS FARGO BANK, N.A AS TRUSTEE FOR THE**
**HOLDERS OF THE FIRST FRANKLIN MORTGAGE LOAN**
**TRUST 2006-FF15 MORTGAGE PASS-THROUGH**
**CERTIFICATES, SERIES 2006-FF15;**
**SHAPIRO and KIRSH, LLP;**

**DEFENDANTS**

### COMPLAINT

Comes Now Harvey Beech, *Pro Se*, for his complaint and states the following;

### JURISDICTIONAL ALLEGATIONS

1.    This is an action for an accounting of monetary transactions on a promissory note

and for injunctive relief regarding a non-judicial foreclosure on real property located in

the county of Lonoke.

2.    At all times material to this lawsuit, the Plaintiff was a resident of Lonoke

County, Arkansas.

3.    At all times material to this lawsuit defendant Select Portfolio Services "(Select)"

is a foreign corporation and it principals principal place of business is located in Salt

Lake City, UT. Its registered agent is the Corporation Service Company. Located at 300

Spring Building, Suite 900, 300 S. Spring Street, Little Rock, AR 72201. It is claiming to

1

be a loan Servicer or agent for Wells Fargo, N.A. as trustee, the defendant referenced in the proceeding paragraph.

4.      At all times material to this lawsuit Defendant Wells Fargo Bank, N.A. as trustee for the holders of the First Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15 is a trust. Its office address is 745 7th Avenue, New York, NY 10019 ("Wells Trust") according to the U.S. Securities and Exchange Commission. It claims to be the holder of the note and mortgage.

5.      Shapiro and Kirsch, LLP ("S&K") is a foreign Limited Liability Partnership; its principal place of business is in Memphis, TN.  Its registered agent is the Corporation Company. Located at 124 West Capitol Avenue, Suite 1900, Little Rock, AR 72201. It was allegedly hired by Select Portfolio to commence a non-judicial foreclosure on the plaintiff's real property.

6.      All acts necessary or precedent to the bringing of this lawsuit occurred or accrued in Lonoke County, Arkansas

7.      This Court has jurisdiction over the subject matter and this is the proper venue.

## STATEMENT OF FACTS

8.      The Plaintiff granted a mortgage and delivered a promissory note to First Franklin, A division of Nat. City Bank of In on August 3, 2006 regarding real property located at 121 Deer Creek Drive Cabot, AR. Legally described as A TRACK OF LAND LOCATED IN PART OF THE NW ¼ OF THE SW ¼ SECTION 11, T4N, R10W, LONOKE COUNTY, ARKANSAS. BEING MORE PARTICULARLY DESCRIBE AS FOLLOWS: BEGINNING AT THE NE CORNER OR THE NE CORNER OF THE NW ¼ SW ¼, SECTION 11; THENCE WEST 438.0 FEET TO THE POINT OF

2

BEGINNING; THENCE SOUTH 587.06 FEET; THENCE WEST 171.0 FEET;

THENCE SOUTH 250.0 FEET; THENCE WEST 200 FEET; THENCE NORTH 837.06

FEET; THENCE EAST 371.0 FEET TO THE POB See **Exhibit A** for mortgage and

**Exhibit B** for an alleged copy of the note.

9.     First Franklin serviced the loan till September 2008.

10.    Select Portfolio allegedly began servicing the loan around October 2008.

11.    On or around July 2009, the plaintiff had his loan paperwork audited.

12.    The plaintiff discovered the note was defective and he was double charged for

closing cost. The note says he agrees to pay $188,000 a loan he has received. The Tila

disclosure shows $182,942.56 as the amount financed. See **Exhibit C** The seller paid the

plaintiffs closing cost see **Exhibit D** for Hud 1 statement. $5,057.44 was added back to

the note. This makes the note default invalid or inflated.

13.    The Plaintiff sent several written requests to Select Portfolio regarding the

accounting of the note.

14.    Select Portfolio responded to the request by sending a letter and an alleged copy

of the note and mortgage. See **Exhibit E**

        a.   The letter claimed Wells Fargo, N.A. as trustee for the holders of First

           Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through

           Certificates Series 2006-FF15 (Wells Trust) was the holder of the note.

        b.   First Franklin, Wells Fargo, or Select Portfolio did not indorse the note

           that "Select" sent as "pay in the order" to. No alloge or assignment of the

           note was attached.

15.    The Plaintiff went to the U.S. Securities and Exchanges Commission to find

information about Wells Trust. See **Exhibit F** for the trust agreement page 1.

     a.  Structured Asset Securities Corporation is listed as the Depositor

     b.  Aurora Loan Services LLC is listed as Master Servicer

     c.  Officetiger Global Real Estate Service Inc., is listed as Credit Risk

        Manager.

     d.  Wells Fargo Bank, N.A. as Trustee.

     e.  Select Portfolio is not listed on this document as a servicer.

     f.  None of the certificates holder's names are in the trust agreement. Federal

        and State Law give the plaintiff the right to know this.

16.    On page 77 of the Trust Agreement referenced in paragraph 13, it states that the

depositor will hereby transfer, assign, set over, deposit with and otherwise convey to the

Trustee, without recourse, subject to Sections 2.02, 2.04, 2.05 and 2.06, in trust, all the

right, title and interest of the Depositor in and to the Mortgage Loans. See **Exhibit G.**

17.    The U.S. Securities and Exchanges Commission had a document named the

mortgage loan sale and assignment agreement see **Exhibit H.**

     a.  Lehman Brothers is listed as the seller.

     b.  Structured Asset Securities Corporation is listed as the purchaser.

     c.  The servicer is listed as National City Home Loan Services, Inc.

     d.  On page 2 it states "WHEREAS, the Seller desires to sell, without

        recourse, all of its rights, title and interest in and to the Mortgage Loans to

        the Depositor, assign all of its rights and interest under the Transfer

        Agreement, the PPTL and the Servicing Agreement relating to the

Mortgage Loans referred to above, and delegate all of its obligations there

under, to the Depositor"

18.   The U.S. Securities and Exchanges Commission had a document named

securitization-servicing agreement See **Exhibit L.**

    a.   National City Home Loan Services Inc is listed as servicer

    b.   Lehman Brothers Holdings Inc. as the seller

    c.   Aurora Loan Services LLC as master servicer

19.   The U.S. Securities and Exchanges Commission had a document named Master

Agreement International Swaps and Derivatives Associations. See **Exhibit J**

    a.   It is a credit default agreement between Lehman brothers, Wells Trust,

        IXIS Financial Products, and Aurora Loan Services LLC.

    b.   If any parties default Wells Trust will receive a one-time payoff.

    c.   Page *9* (i) describes the events of default and whom it paid.

20.   The multiple entities that are referenced in paragraphs 15-18 do not have their

interest recorded in Lonoke County Real Estate Records.

21.   On or about April 14, 2010 the plaintiff received a notice of default from Shapiro

and Kirsch. See **Exhibit K**

22.   The Plaintiff responded by sending a debt validation demand. See **Exhibit L.**

23.   Shapiro and Kirsch responded by sending the same copy promissory note and

mortgage that Select Portfolio sent as referenced in Paragraph 14. See **Exhibit M** for the

cover letter.

24.   On August 21, 2009 a Mortgagee's Acceleration of Maturity and Limited power

of attorney for non-judicial sale was filed in Lonoke Real Estate records See **Exhibit N**

a. Select Portflio is listed as attorney in fact for Wells Fargo Bank, N.a.

b. Shapiro and Kirsch prepared this document.

c. Paul Langford a document control officer signed it.

d. No authorized officer listed in the Trust agreement referenced in paragraph 15 signed this agreement.

25.    On May 12, 2010 the plaintiff sent another written request to Select Portfolio and carbon copied Shapiro and Kirsch see **Exhibit N.**

26.    Select Portfolio and Wells Fargo Bank, N.A. as trustee for the holders of the First Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15 has no beneficial interest in the mortgage or note.

27.    Shapiro and Kirsch cannot be an attorney in fact because "Select" and "Wells Trust" have no interest.

28.    The Plaintiff does not know the real party at interest to make a full settlement.

**LAW**

29.    Arkansas is a recording state. See *Ark. Code Ann §14-15-404* Missing recorded assignments by First Franklin, Lehman Brothers, Wells Fargo, Structured Asset Securities Corporation, National City Home Loan Services, Aurora Loan Services LLC and any other entity in the chain of the subject title is contrary to law. Satisfactory evidence of an assignment protects Plaintiff from another action by an alleged assignor, and which shows that there was a full and complete assignment of the claim from an assignor who was the real party in interest with respect to the claim. Wells Fargo Bank, N.A. as trustee for the holders of the First Franklin Mortgage Loan Trust 2006-FF15

6

Mortgage Pass-Through Certificates, Series 2006-FF15 is a trust should be held to have no ownership or beneficial interest in the subject mortgage

30.     *A statutory foreclosure is subject to a judicial review.* Matlock v. Lomas Mtg. U.S.A., Inc., 154 B.R. 721(Bankr. E.D. Ark. 1993). This complaint was filed to give this court a judicial review of the plaintiff's defenses.

31.     The Plaintiffs note is defective and not valid. He was double charged for closing cost. *There can be no holder in due course of a negotiable instrument arising out of an illegal transaction.* Pacific Nat'l Bank v. Hernreich, 240 Ark. 114, 398 S.W.2d 221(1966)

32.     *Pledgee of note was not "holder in due course" where the note pledged to it was never endorsed as required by Ark Ann § 4-3-204* Lane v. Midwest Bancshares Corp., 337 F. Supp. 1200 (E.D. Ark. 1972). Select and Shipario and Kirsh has sent the plaintiff the same note that was not endorsed (3) three different times. The parties referenced in the above paragraphs never endorsed the note.

33.     *Surety had burden of proving that purported transactions concerning execution of note and mortgage which surety sought to foreclose were the genuine actions of corporate board before it could rely on this or any other provision of Ark Ann § 4-3-302.* National Surety Corp. v. Crystal Springs Fishing Village, Inc., 326 F. Supp. 1171 (W.D.Ark. 1971). The defendants have not proved that any of the entities referenced above had any interest in the note and mortgage.

34.     *Where assignee was not a holder in due course, the note was subject to defense by the makers against assignor, and it was proper for court to allow set-off, cancel and*

*satisfy the note, and dismiss assignee's claim.* Richardson v. Girner, 282 Ark. 302, 668 S.W.2D 523 (1984)  Wells Trust and Select Portfolio are not assignees.

35.     *The creditor, as an assignee of the defendant's mortgage note, could not sue on the underlying debt the defendants owed to the original mortgagee; and for the creditor to have prevailed in enforcing the note, it was required either to produce the original or satisfy the requirements for a lost negotiable instrument under 4-3-309(a) and (b).* McKay v. Capital Resources Co., 327 Ark. 737, 940 S.W.2d 869 (1997) The Plaintiff asked to view the original note when he sent Select Portfolio and Shapiro and Kirsch letters regarding the debt and ownership. Select and S&K will not let the plaintiff come to their offices to view the original.

36.     Bank v. Thornton, 19 S.W.3d 48 (Ark. Ct. App., 2000) *The assignee's burden of proving the existence of the assignment is met by evidence that is satisfactory in character to protect the defendant from another action by the alleged assignor, and which shows that there was a full and complete assignment of the claim from an assignor who was the real party in interest with respect to the claim.* According to documents registered with the U.S. Securities and Exchange Commission entities First Franklin, Lehman Brothers, Wells Fargo, Structured Asset Securities Corporation, National City Home Loan Services and Aurora Loan Services LLC may have had an interest in the note and mortgage. The plaintiff has not been provided with any valid assignment of note regarding these entities.

## TEMPORARY INJUNCTIVE RELIEF

37.     The Plaintiff restates the foregoing paragraphs 1-38.

*38.*   The Plaintiffs note is defective and the sellers paid closing cost were added back in the note.

*39.*   The defendants Select and Wells Trust have not proved it is the real party at interest to the plaintiff's note and mortgage.

*40.*   Shapiro and Kirsch cannot be attorneys in fact because Select and Wells Trust are not the real parties at interest.

*41.*   Imminent likelihood of irreparable harm if a temporary injunction is not issued.

*42.*   Unavailability of adequate remedy at law, i.e., an award of money damages alone will not restore the plaintiff's threatened loss of his home.

*43.*   Threatened harm to the plaintiff outweighs any possible harm to defendants.

*44.*   Granting of injunction will not contravene the public interest.

*45.*   Plaintiff has a substantial likelihood of success on the merits of underlying case.i.e., the cause for which plaintiff seeks an injunction has been proven.

WHEREFORE, the plaintiff prays that the court orders to defendants cease and desist foreclosure actions and collection attempts.

      a.  That this court compels Select and Wells Trust to provide a full accounting of all monetary transactions; including source of funds, payments to the certificate holders, and credit default payments it received.

      b.  Compel Select and Wells Trust to provide the names of the certificate holders.

c.  The Plaintiff shall have the right to amend this pleading for additional

causes of action in the future.

Respectfully Submitted,

Harvey Beech, Pro Se
121 Deer Creek
Cabot, AR 72023
501-247-2873

DOC# 200611768

This instrument was prepared by:
Name:   ALYSON SMITH
Address: FIRST FRANKLIN
        14643 DALLAS PARKWAY, SUITE 675, DALLAS, TX 75254

RETURN TO: 7010054(6Lmch
STEWART TITLE OF ARKANSAS
11300 RODNEY PARHAM RD.-SUITE 100
LITTLE ROCK, AR 72212

———————————————— [Space Above This Line For Recording Data] ————————————————

# MORTGAGE

MIN: 100425240009289445

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated          August 03, 2006          , together with all Riders to this document.

(B)  "Borrower" is HARVEY E BEECH and FAITH BEECH, HUSBAND AND WIFE

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is FIRST FRANKLIN  A DIVISION OF NAT. CITY BANK OF IN
Lender is a National Association                                      organized and existing under
the laws of United States of America                                 . Lender's address is
2150 NORTH FIRST STREET, SAN JOSE, California  95131

(E)  "Note" means the promissory note signed by Borrower and dated          August 03, 2006          . The Note states that Borrower owes Lender One Hundred Eighty Eight Thousand and no/100
                              Dollars (U.S. $188,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than September 01, 2036

(F)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

ARKANSAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3004 1/01
ITEM 9877L1 (0601)—MERSMFAR3115                      (Page 1 of 12 pages)       4000928944 GreatDocs ™
                                                                                To Order Call: 1-800-968-5775

HES FB                                                Exhibit A

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider     ☐ Condominium Rider     ☐ Second Home Rider

☐ Balloon Rider     ☐ Planned Unit Development Rider     ☒ Other(s) [specify] Prepay Rider

☐ 1-4 Family Rider     ☐ Biweekly Payment Rider

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
COUNTY                                      of                              LONOKE                    :
[Type of Recording Jurisdiction]                                      [Name of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A"

which currently has the address of                          121 DEER CREEK DRIVE
                                                                              [Street]

CABOT                          , Arkansas                72023                  ("Property Address"):
[City]                                                        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property". Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are

accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

FB

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event,

or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if

Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.   .

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)   Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)   Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.   Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the

ARKANSAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 9807L2 (0501)—MERS MFAR3115

(Page 7 of 12 pages)

Form 3004 1/01

4000928344 GreatDocs ™
To Order Call: 1-800-968-5775

third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument

ARKANSAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 9677L3 (0611)—MERS MFAR3115                    (Page 8 of 12 pages)

Form 3004 1/01

4000928844 GreatDocs™
To Order Call 1-800-968-5775

are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17.  **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18.  **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.  **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.  **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene,

ARKANSAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 9677L9 (0601)—MERS MFAR3115

*(Page 9 of 12 pages)*

Form 3004 1/01

4000928944 GreatDocs™
To Order Call: 1-800-968-5775

other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.  **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

It is understood and agreed to by Borrower that this Security Instrument is subject to the foreclosure procedures of the Arkansas Statutory Foreclosure Law, Act 53 of 1987, as amended from time to time (the "Act"), for Borrower's breach of any covenant or agreement in this Security Instrument. In furtherance and not in limitation of the provisions of Section 12, any forbearance by Lender in exercising any right or remedy under the Act shall not be a waiver of or preclude acceleration and the exercise of any right or remedy under the Act, or at the option of Lender, use of judicial foreclosure proceedings.

23.  **Release.** Upon payment in full of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  **Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 12 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
HARVEY E. BEECH            -Borrower          FAITH BEECH                Non-Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                     -Borrower

Witness:                                     Witness:

_____                  _____

ARKANSAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3004 1/01

ITEM 9877L11 (0501)—MERS MFAR3115                    (Page 11 of 12 pages)         4000928944 GreatDocs™
                                                                                  To Order Call: 1-800-968-5775

State of Arkansas
County of Pulaski

    On this the **3rd** day of **August 2006**, before me,
the undersigned officer, personally appeared HARVEY E. BEECH, FAITH BEECH , Husband and wife

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same for the purposes therein contained.
    In witness whereof I hereunto set my hand and official seal.

                        *Teresa Ashley*
                                        Notary Public



                        My commission expires: **10-07-2014**

After Recording Return To: FIRST FRANKLIN
                      c/o SECURITY CONNECTIONS
                      1935 INTERNATIONAL WAY
                      IDAHO FALLS, ID 83402

Person authorized to release lien:
Title:                                  Telephone No.:

ARKANSAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3004 1/01

ITEM 9877L12 (0501)—NERSMFAR3115              *(Page 12 of 12 pages)*        4000928944 GreatDocs™
                                                  To Order Call: 1-800-968-5775

# PREPAYMENT RIDER

This Prepayment Rider is made this   3rd   day of   August 2006   , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or the Security Deed (the "Security Instrument") of the same date given by the undersigned ( the "Borrower" ) to secure Borrower's Note ( the "Note" ) to

FIRST FRANKLIN A DIVISION OF NAT. CITY BANK OF IN
("the Lender") of the same date and covering the property described in the Security Instrument and located at:

121 DEER CREEK DRIVE<br>CABOT, AR 72023

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower can make a partial prepayment at anytime without paying any charge. Borrower may make a full prepayment at anytime subject to a prepayment charge as follows:

If within the first   36   months after the date Borrower executes the Note, Borrower makes a full prepayment (including prepayments occurring as a result of the acceleration of the maturity of the Note), Borrower must, as a condition precedent to a full prepayment, pay a prepayment charge not to exceed:

- 3   percent of the unpaid principal balance if the loan is prepaid within the first year.
- 2   percent of the unpaid principal balance if the loan is prepaid within the second year.
- 1   percent of the unpaid principal balance if the loan is prepaid within the third year.
- 0   percent of the unpaid principal balance if the loan is prepaid within the fourth year.
- 0   percent of the unpaid principal balance if the loan is prepaid within the fifth year.

**NOTICE TO BORROWER**

Do not sign this Prepayment Rider before you read it. This Loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____ (Seal)       _____ (Seal)
HARVEY E. BEECH          -Borrower    FAITH BEECH             Non -Borrower

_____ (Seal)       _____ (Seal)
                         -Borrower                            -Borrower

_____ (Seal)       _____ (Seal)
                         -Borrower                            -Borrower

Adjustable Rate Prepayment Rider - 1st Liens - AR, IL, IN, KY, MI, MS & OH
Fixed Rate and Balloon Prepayment Rider - 1st Liens – AR, IL, IN, KY & MS
MFCD6035
FF008710                                                          4000928944

## LEGAL DESCRIPTION

A TRACT OF LAND LOCATED IN PART OF THE NW ¼ OF THE SW ¼
SECTION 11, T4N, R10W, LONOKE COUNTY, ARKANSAS. BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE NE
CORNER OF THE NE CORNER OF THE NW ¼ SW ¼ , SECTION 11; THENCE
WEST 438.0 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 587.06
FEET; THENCE WEST 171.0 FEET; THENCE SOUTH 250.0 FEET; THENCE
WEST 200 FEET; THENCE NORTH 837.06 FEET; THENCE EAST 371.0 FEET
TO THE POB.

CERTIFICATE OF RECORD
DOC#RECORDING200611768
08/25/2006          03:17:43 PM
Filed & Recorded in Official Records of
LONOKE COUNTY
DEBORAH OGLESBY CIRCUIT CLERK
Fees $47.00
BY_____ D.C.

# NOTE

August 03, 2006
[Date]

North Little Rock
[City]

Arkansas
[State]

121 DEER CREEK DRIVE
CABOT, AR 72023
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 188,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
FIRST FRANKLIN  A DIVISION OF NAT. CITY BANK OF IN
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    7.9000 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1st    day of each month beginning on    October 01, 2006.
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    September 01, 2036    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 150 ALLEGHENY CENTER MALL, PITTSBURGH, PA 15212

or at a different place if required by the Note Holder.

### (B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,366.39

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**THE PREPAYMENT NOTE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF
AMENDS THE PREPAYMENT PROVISIONS OF THIS NOTE**

Initials    Initials    Initials    Initials    Initials    Initials

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01

ITEM 1848L1 (0011)  MFCD3002    (Page 1 of 3 pages)    4000928944    GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

**5.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

   **(A)  Late Charge for Overdue Payments**

   If the Note Holder has not received the full amount of any monthly payment by the end of           Fifteen           calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be           5.0000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

   **(B)  Default**

   If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

   **(C)  Notice of Default**

   If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

   **(D)  No Waiver By Note Holder**

   Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

   **(E)  Payment of Note Holder's Costs and Expenses**

   If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

   Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

   Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

   If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

   I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

   This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01

ITEM 1648L2 (0011)  MFCD3002                          *(Page 2 of 3 pages)*          GREATLAND ■
4000928944          To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131

this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower has executed and acknowledges receipt of pages 1 through 3 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)          _____ (Seal)
HARVEY E. BEECH                    -Borrower                                           -Borrower

_____ (Seal)          _____ (Seal)
                                   -Borrower                                           -Borrower

_____ (Seal)          _____ (Seal)
                                   -Borrower                                           -Borrower

*[Sign Original Only]*

# PREPAYMENT NOTE ADDENDUM

This prepayment Note Addendum is made this      3rd       day of      August 2006      , and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") given by the undersigned (the "Borrower") to evidence Borrower's indebtedness to FIRST FRANKLIN  A DIVISION OF NAT. CITY BANK OF IN (the "Lender"), which indebtedness is secured by a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), of the same date and covering the property described in the Security Instrument and located at:

121 DEER CREEK DRIVE<br>CABOT, AR  72023

**ADDITIONAL COVENANTS.**  Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

    1. Section 4 of the Fixed Rate Note, is modified to provide for a prepayment charge upon Borrower's full prepayment.  A "full prepayment" is the prepayment of all of the unpaid principal due under the Note.  A prepayment of only part of the unpaid principal is known as a "partial prepayment."

Borrower can make a partial prepayment at anytime without paying any charge.  Borrower may make a full prepayment at anytime subject to a prepayment charge as follows:

If within the first      36      months after the date Borrower executes the Note, Borrower makes a full prepayment (including prepayments occurring as a result of the acceleration of the maturity of the Note), Borrower must, as a condition precedent to a full prepayment, pay a prepayment charge not to exceed:

- 3  percent of the unpaid principal balance if the loan is prepaid within the first year.
- 2  percent of the unpaid principal balance if the loan is prepaid within the second year.
- 1  percent of the unpaid principal balance if the loan is prepaid within the third year.
- 0  percent of the unpaid principal balance if the loan is prepaid within the fourth year.
- 0  percent of the unpaid principal balance if the loan is prepaid within the fifth year.

    2. All other provisions of the Note are unchanged by this addendum and remain in full force and effect.

NOTICE TO BORROWER

**Do not sign this Prepayment Rider before you read it. This Loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.**

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Note Addendum.

_____ (Seal)       _____ (Seal)
HARVEY E. BEECH                -Borrower                        -Borrower

_____ (Seal)       _____ (Seal)
                                          -Borrower                        -Borrower

_____ (Seal)       _____ (Seal)
                                          -Borrower                        -Borrower

**Fixed Rate and Balloon Prepayment Note Addendum - 1ˢᵗ Liens – AR, IL, IN, KY & MS**        4000928944
FF02121O  MFCD6030

# NOTE

August 03, 2006                         North Little Rock                         Arkansas
[Date]                                       [City]                                      [State]

121 DEER CREEK DRIVE
CABOT, AR 72023
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 188,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
FIRST FRANKLIN  A DIVISION OF NAT. CITY BANK OF IN
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      7.9000 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     1st     day of each month beginning on        October 01, 2006
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on        September 01, 2036       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 150 ALLEGHENY CENTER MALL, PITTSBURGH, PA 15212

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,366.39

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**THE PREPAYMENT NOTE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF**
**AMENDS THE PREPAYMENT PROVISIONS OF THIS NOTE**

_____ _____ _____ _____ _____ _____
Initials   Initials   Initials   Initials   Initials   Initials

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3200 1/01
4000928944                    GREATLAND ■
ITEM 1846L1 (0011)  MFCD3002                    (Page 1 of 3 pages)                    To Order Call: 1-800-530-8353 □ Fax: 616-791-1131

Exhibit B

**5.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of          Fifteen          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          5.0000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3200 1/01

ITEM 1648L2 (0011)   MFCD3002          *(Page 2 of 3 pages)*          4000928944          GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower has executed and acknowledges receipt of pages 1 through 3 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)   _____ (Seal)
HARVEY E. BEECH          -Borrower                            -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                            -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                            -Borrower

*[Sign Original Only]*

**MULTISTATE FIXED RATE NOTE**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          **Form 3200 1/01**

ITEM 1846L3 (0011)  MFCD3002          *(Page 3 of 3 pages)*          4000928944          GREATLAND ■
To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131

EXHIBIT 4

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 12 2010

JAMES W. McCORMACK, CLERK
By:_____
DEP. CLERK

**Borrower:**
HARVEY E. BEECH
121 DEER CREEK DRIVE
CABOT, AR 72023

**Creditor:**
FIRST FRANKLIN
A DIVISION OF NAT. CITY BANK OF IN
2150 NORTH FIRST STREET
SAN JOSE, CA 95131

Loan Number: 4000828944

Date: 08/03/2006

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after your have made all payments as scheduled. |
| 8.1878% | $308,964.22 | $182,942.56 | $491,906.78 |

Your payment schedule will be:

| No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmtr. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin |
|---|---|---|---|---|---|---|---|---|
| 359 | $1,366.39 | 10/01/2006 | | | | | | |
| 1 | $1,372.77 | 09/01/2036 | | | | | | |

THIS LOAN WILL CONTAIN A PREPAYMENT PENALTY FOR 36 MONTHS.

INSURANCE: The following insurance is required to obtain credit:    *Property
You may obtain the insurance from anyone that is acceptable to creditor.

SECURITY: You are giving a security interest in the real property being purchased.
Property address: 121 DEER CREEK DRIVE. CABOT, AR  72023

LATE CHARGE:  If a payment is more than 15 days late, you will be charged 5.0000% of the payment.

PREPAYMENT: If you pay off your loan early. * You may have to pay a penalty.
* You will not be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property cannot assume the remainder of your loan on the  original terms.
THE ANNUAL PERCENTAGE RATE (APR) IS NOT THE SAME AS THE INTEREST RATE (NOTE RATE) OF THE MORTGAGE FOR WHICH
YOU APPLIED. THE NOTE RATE DESCRIBES ONLY THE INTEREST. THE APR, WHICH IS USUALLY HIGHER, INCLUDES OTHER
ITEMS SUCH AS DISCOUNT POINTS, FEES, FINANCE CHARGES AND CERTAIN OTHER CHARGES WHICH ARE REQUIRED TO BE PAID
TO OBTAIN THE LOAN.

See your contract documents for any additional information about nonpayment, default, any required repayment
in full before the scheduled date, and prepayment refunds and penalties.

HARVEY E. BEECH                              8/3/06
_____     _____
HARVEY E. BEECH                                      DATE

_____     _____
FAITH BEECH                                          DATE

Exhibit C

| | | |
|---|---|---|
| 8/4/06 2:20 PM | | OMB No. 2502-0265 |

A. U.S. Department of Housing and Urban Development

B. Type of Loan
1. [ ] FHA   2. [ ] FMHA   3. [X] Conv. Unins.
4. [ ] VA   5. [ ] Conv. Ins.
6. File Number: 705C546
7. Loan Number: 4000928944
8. Mortgage Ins. Case No.

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
**JAN 1 2 2010**
JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**Settlement Statement**

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown here. Items marked "(POC)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

D. Name of Borrower: Harvey E. Beech, 186 Grant 157041, Sheridan, AR 72150

E. Name of Seller: Sharon Kay Edrington-Comstock   TIN: 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

F. Name of Lender: First Franklin, a division of National City Bank, 14843 Dallas Parkway, Suite 675, Dallas, TX 75254

G. Property Location: 121 Deer Creek Drive, Cabot, AR 72023

H. Settlement Agent: Stewart Title of Arkansas, Inc. (888) 734-2749   TIN: 71-0560067
Place of Settlement: 5532 JFK Blvd, North Little Rock, AR 72116

I. Settlement Date: 8/3/2006   Disbursement Date: 8/3/2006

| | J. Summary of Borrower's Transaction | | | K. Summary of Seller's Transaction | |
|---|---|---|---|---|---|
| 100. | Gross amount due from borrower: | | 400. | Gross amount due to seller: | |
| 101. | Contract sales price | 235,000.00 | 401. | Contract sales price | 235,000.00 |
| 102. | Personal property | | 402. | Personal property | |
| 103. | Settlement charges to borrower (line 1400) | 8,345.19 | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| | Adjustments for items paid by seller in advance: | | | Adjustments for items paid by seller in advance: | |
| 106. | City/town taxes | | 406. | City/town taxes | |
| 107. | County taxes | | 407. | County taxes | |
| 108. | Assessments | | 408. | Assessments | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 120. | Gross amount due from borrower | 243,345.19 | 420. | Gross amount due to seller | 235,000.00 |
| 200. | Amounts paid by or in behalf of the borrower: | | 500. | Reduction in amount due to seller: | |
| 201. | Deposit or earnest money | 500.00 | 501. | Excess deposit (see instructions) | |
| 202. | Principal amount of new loan(s) | 188,000.00 | 502. | Settlement charges to seller (line 1400) | 16,081.75 |
| 203. | Existing loan(s) taken subject to | | 503. | Existing loan(s) taken subject to | |
| 204. | | | 504. | Payoff of first mortgage loan | 188,994.17 |
| 205. | | | 505. | Payoff of second mortgage loan | |
| 206. | Refund Appraisal Fee | 375.00 | 506. | 6 days rent @ $70 per day 8/9 to 8/14 | 420.00 |
| 207. | 2nd Mortgage Proceeds | 45,914.04 | 507. | | |
| 208. | | | 508. | No Homewarranty | |
| 209. | Closing Cost paid by seller | 8,000.00 | 509. | Closing Cost paid by seller | 8,000.00 |
| | Adjustments for items unpaid by seller: | | | Adjustments for items unpaid by seller: | |
| 210. | City/town taxes | | 510. | City/town taxes | |
| 211. | County taxes   1/1/2006   to 8/3/2006 | 683.12 | 511. | County taxes   1/1/2006   to 8/3/2006 | 683.12 |
| 212. | Assessments | | 512. | Assessments | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. | Total paid by/for borrower: | 243,472.15 | 520. | Total reduction in amount due seller: | 218,179.04 |
| 300. | Cash at settlement from/to borrower: | | 600. | Cash at settlement to/from seller: | |
| 301. | Gross amount due from borrower (line 120) | 243,345.19 | 601. | Gross amount due to seller (line 420) | 235,000.00 |
| 302. | Less amount paid by/for borrower (line 220) | 243,472.15 | 602. | Less total reduction in amount due seller(line 520) | 218,179.04 |
| 303. | CASH ( )FROM (X)TO BORROWER | 126.96 | 603. | CASH ( )FROM (X)TO SELLER | 16,820.96 |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.
SELLER INSTRUCTION - If this real estate was your principal residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your tax return, for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide Stewart Title of Arkansas, Inc. (888) 734-2749 with your correct taxpayer identification number.
If you do not provide Stewart Title of Arkansas, Inc. (888) 734-2749 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

**Exhibit D**

| L. Settlement Charges | 8/4/06 2:20 PM | File Number: 7060548 | |
|---|---|---|---|
| 700. | Total sales/broker commission   based on : $235,000.00 @ :.0000% = $16,450.00 | **Paid From Borrower's Funds at Settlement** | **Paid From Seller's Funds at Settlement** |
| | Division of commission (line 700) as follows: | | |
| 701. | $9,870.00 | to Coldwell Banker | | |
| 702. | $6,580.00 | to McKimmey | | |
| 703. | Commission paid at settlement $16,450.00 | | 16,450.00 |
| 704. | $500.00 earnest money retained by Listing Broker as .POC. | | |
| 800. | Items payable in connection with loan | | |
| 801. | Loan origination fee | to First Franklin, a division of N | 2,055.03 | |
| 802. | Loan discount | | |
| 803. | Appraisal fee $375 POCB | to Smith Appraisal | 375.00 | |
| 804. | Credit report | | |
| 805. | Lender's inspection fee | | |
| 806. | Mortgage insurance application fee | | |
| 807. | Assumption fee | | |
| 808. | Underwriting Fee | | |
| 809. | Flood Certification Fee | to LSI Flood Services | 5.00 | |
| 810. | Tax Service Fee | to First Franklin, a division of National City Bank | 72.00 | |
| 811. | Compliance Review | to First Franklin, a division of National City Bank | 15.00 | |
| 812. | Popints pre-paid | to First Franklin, a division of National City Bank | 453.00 | |
| 813. | Processing Fee | to U.S. Mortgage | 501.00 | |
| 814. | Broker Fee | to U.S. Mortgage   POCL 2088.00 | | |
| 900. | Items required by lender to be paid in advance | | |
| 901. | Interest from   8/3/2006 to 9/1/2006   at $41.2558/day for 29 days. | 1,196.41 | |
| 902. | Mortgage insurance premium for | | |
| 903. | Hazard insurance premium for   1 yrs.   to Shelter | 1,250.00 | |
| 904. | | | |
| 905. | VA Funding Fee | | |
| 1000. | Reserves deposited with lender | | |
| 1001. | Hazard Insurance | | |
| 1002. | Mortgage Insurance | | |
| 1003. | City property taxes | | |
| 1004. | County property taxes | | |
| 1005. | Annual assessments (maint.) | | |
| 1006. | | | |
| 1007. | | | |
| 1008. | | | |
| 1009. | Aggregate Adjustment | | |
| 1100. | Title charges | | |
| 1101. | Settlement or closing fee | to Stewart Title of Arkansas, Inc. | 470.00 | 470.00 |
| 1102. | Abstract or title search | to Grand Prairie Title | 100.00 | |
| 1103. | Title examination | to Stewart Title of Arkansas, Inc. | 150.00 | |
| 1104. | Title Insurance binder | | |
| 1105. | Document preparation. | | |
| 1106. | Notary fees | | |
| 1107. | Attorney's fees to | | |
| | Includes above items no.: | | |
| 1108. | Title insurance | to Grand Prairie Title | 776.00 | 585.00 |
| | Includes above items no.: | | |
| 1109. | Lender's coverage | $188,000.00   $776.00 | | |
| 1110. | Owner's coverage | $235,000.00   $585.00 | | |
| 1111. | Tax Report | to Grand Prairie Title | 25.00 | |
| 1112. | | | |
| 1113. | Delivery Service Fee | to Stewart Title of Arkansas, Inc. | 25.00 | 25.00 |
| 1114. | Wire Fee | to Stewart Title of Arkansas, Inc. | 10.00 | |
| 1115. | | | |
| 1200. | Government recording and transfer charges | | |
| 1201. | Recording fees:   Deed $14.00 Mortgage $65.00 Release $14.00 | 79.00 | 14.00 |
| 1202. | City/county tax/stamps: | | |
| 1203. | State tax/stamps:   Deed $775.50 | 387.75 | 387.75 |
| 1204. | | | |
| 1205. | | | |
| 1206. | | | |
| 1300. | Additional settlement charges | | |
| 1301. | Survey | to Bobby Shaw | 150.00 | 150.00 |
| 1302. | Pest Inspection   NONE REQUIRED | | |
| 1303. | Appraisal Desk Review | to Thomas McRae | 250.00 | |
| 1304. | | | |
| 1305. | | | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | 8,345.19 | 18,081.75 |



P.O. Box 65777
Salt Lake City, UT 84165

September 23, 2009

Harvey E. Beech
121 Deer Creek Drive
Cabot, AR 72023

*Re:      Select Portfolio Servicing Loan No. 0011589421*

Dear Harvey E. Beech:

This letter acknowledges receipt of your correspondence received August 31, 2009 that states it is a request for Validation of Debt.

The current Note holder is the Wells Fargo Bank, National Association, as trustee for the holders of the First Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15. Select Portfolio Servicing, Inc. (SPS) is the servicer of this loan. Our address is listed above and our telephone number is listed at the end of this letter.

To validate this debt, we have enclosed a copy of the signed Note and Mortgage. Also for your review we have enclosed the Notice of Assignment, Sale or Transfer of Servicing Rights dated September 23, 2008.

Since your letter does not include a statement of the reason(s) why you believe the mortgage account is in error, we are unable to provide you with a detailed response. Further, the information and documents you requested will not be provided, as they are proprietary, and are not specific to the servicing of the mortgage.

Your correspondence states that failure by SPS to respond to certain items grants you unlimited Power of Attorney on behalf of SPS. SPS expressly does not grant a power of attorney to anyone regarding this loan. Any attempt to forge or sign any documents or make any representations on behalf of SPS will result in appropriate legal action.

We consider these matters resolved. If you are having difficulty making the monthly payments, please contact our Loan Resolution Department at 888-818-6032 or visit our website at www.spservicing.com to learn more about loan resolution options that may be available.

Sincerely,

Jillian Jones-Peacock
Contested Default Management

*Exhibit E*

1



P.O. Box 65777
Salt Lake City, UT 84165

Enclosures:    Note
               Mortgage
               Notice of Assignment, Sale or Transfer of Servicing Rights dated September 23,
               2008

ESTA CARTA CONTIENE INFORMACIÓN IMPORTANTE CONCERNIENTE A SUS DERECHOS. POR FAVOR, HÁGALA
TRADUCIR. NUESTROS REPRESENTANTES BILINGÜES ESTÁN A SU DISPOSICIÓN PARA CONTESTAR CUALQUIER
PREGUNTA LLAMANDO AL TELÉFONO PEAJE LIBRE 800-831-0118 Y MARQUE LA OPCIÓN 2.

*This communication from a debt collector is an attempt to collect a debt and any information
obtained will be used for that purpose.*

MINNESOTA – THIS COLLECTION AGENCY IS LICENSED BY THE MINNESOTA DEPARTMENT OF
COMMERCE
NEW YORK CITY – COLLECTION AGENCY LICENSE #098725

2

OFFICETIGER GLOBAL REAL ESTATE SERVICES INC., as Credit Risk Manager,

and

WELLS FARGO BANK, N.A., as Trustee

TRUST AGREEMENT

Dated as of October 1, 2006

FIRST FRANKLIN MORTGAGE LOAN TRUST
MORTGAGE PASS-THROUGH CERTIFICATES
SERIES 2006-FF15

**EXHIBIT F**

## TABLE OF CONTENTS

Page

### ARTICLE I DEFINITIONS

| | | |
|---|---|---|
| Section 1.01. | Definitions. | 15 |
| Section 1.02. | Calculations Respecting Mortgage Loans. | 58 |
| Section 1.03. | Calculations Respecting Accrued Interest. | 58 |

### ARTICLE II DECLARATION OF TRUST; ISSUANCE OF CERTIFICATES

| | | |
|---|---|---|
| Section 2.01. | Creation and Declaration of Trust Fund; Conveyance of Mortgage Loans. | 58 |
| Section 2.02. | Acceptance of Trust Fund by Trustee: Review of Documentation for Trust Fund. | 63 |
| Section 2.03. | Representations and Warranties of the Depositor. | 64 |
| Section 2.04. | Discovery of Breach. | 66 |
| Section 2.05. | Repurchase, Purchase or Substitution of Mortgage Loans. | 67 |
| Section 2.06. | Grant Clause. | 68 |

### ARTICLE III THE CERTIFICATES

| | | |
|---|---|---|
| Section 3.01. | The Certificates. | 69 |
| Section 3.02. | Registration. | 70 |
| Section 3.03. | Transfer and Exchange of Certificates. | 71 |
| Section 3.04. | Cancellation of Certificates. | 77 |
| Section 3.05. | Replacement of Certificates. | 77 |
| Section 3.06. | Persons Deemed Owners. | 77 |
| Section 3.07. | Temporary Certificates. | 78 |
| Section 3.08. | Appointment of Paying Agent. | 78 |
| Section 3.09. | Book-Entry Certificates. | 79 |

### ARTICLE IV ADMINISTRATION OF THE TRUST FUND

| | | |
|---|---|---|
| Section 4.01. | Collection Account. | 81 |
| Section 4.02. | Application of Funds in the Collection Account. | 83 |
| Section 4.03. | Reports to Certificateholders. | 85 |
| Section 4.04. | Certificate Account. | 89 |
| Section 4.05. | [Reserved] | 90 |

### ARTICLE V DISTRIBUTIONS TO HOLDERS OF CERTIFICATES

| | | |
|---|---|---|
| Section 5.01. | Distributions Generally. | 90 |
| Section 5.02. | Distributions from the Certificate Account. | 91 |
| Section 5.03. | Allocation of Losses. | 105 |
| Section 5.04. | Advances by Master Servicer, Servicer and Trustee. | 105 |
| Section 5.05. | Compensating Interest Payments. | 106 |
| Section 5.06. | Basis Risk Reserve Fund. | 106 |
| Section 5.07. | Supplemental Interest Trust. | 107 |
| Section 5.08. | Rights of Swap Counterparty. | 109 |
| Section 5.09. | Termination Receipts. | 109 |

SEC Info - First Franklin Mortgage Loan Trust 2006-FF15 - 8-K - For ...                    http://www.secinfo.com/d12TC3.v1Dq6.d.htm

i

## ARTICLE VI

### CONCERNING THE TRUSTEE; EVENTS OF DEFAULT

| | | |
|---|---|---|
| Section 6.01. | Duties of Trustee. | 110 |
| Section 6.02. | Certain Matters Affecting the Trustee . | 113 |
| Section 6.03. | Trustee Not Liable for Certificates. | 114 |
| Section 6.04. | Trustee May Own Certificates. | 115 |
| Section 6.05. | Eligibility Requirements for Trustee. | 115 |
| Section 6.06. | Resignation and Removal of Trustee. | 115 |
| Section 6.07. | Successor Trustee. | 116 |
| Section 6.08. | Merger or Consolidation of Trustee. | 117 |
| Section 6.09. | Appointment of Co-Trustee, Separate Trustee or Custodian. | 117 |
| Section 6.10. | Authenticating Agents. | 119 |
| Section 6.11. | Indemnification of Trustee. | 120 |
| Section 6.12. | Fees and Expenses of Trustee and Custodian. | 121 |
| Section 6.13. | Collection of Monies. | 121 |
| Section 6.14. | Events of Default; Trustee To Act; Appointment of Successor. | 122 |
| Section 6.15. | Additional Remedies of Trustee Upon Event of Default. | 126 |
| Section 6.16. | Waiver of Defaults. | 126 |
| Section 6.17. | Notification to Holders. | 127 |
| Section 6.18. | Directions by Certificateholders and Duties of Trustee During Event of Default. | 127 |
| Section 6.19. | Action Upon Certain Failures of the Master Servicer and Upon Event of Default. | 127 |
| Section 6.20. | Preparation of Tax Returns and Other Reports. | 127 |
| Section 6.21. | Reporting Requirements of the Commission. | 134 |
| Section 6.22. | No Merger. | 135 |
| Section 6.23. | Indemnification by the Trustee. | 135 |

### ARTICLE VII PURCHASE OF MORTGAGE LOANS AND TERMINATION OF THE TRUST FUND

| | | |
|---|---|---|
| Section 7.01. | Purchase of Mortgage Loans; Termination of Trust Fund Upon Purchase or Liquidation of All Mortgage Loans; Purchase of Lower Tier REMIC 1 Uncertificated Regular Interests. | 135 |
| Section 7.02. | Procedure Upon Termination of Trust Fund or Purchase of Lower Tier REMIC 1 Uncertificated Regular Interests. | 137 |
| Section 7.03. | Additional Trust Fund Termination Event or Purchase of the Lower Tier REMIC 1 Uncertificated Regular Interests. | 139 |
| Section 7.04. | Optional Repurchase Right. | 140 |

### ARTICLE VIII RIGHTS OF CERTIFICATEHOLDERS

| | | |
|---|---|---|
| Section 8.01. | Limitation on Rights of Holders. | 140 |
| Section 8.02. | Access to List of Holders. | 141 |
| Section 8.03. | Acts of Holders of Certificates. | 141 |

ii

ARTICLE IX ADMINISTRATION AND SERVICING OF MORTGAGE LOANS BY THE MASTER SERVICER; CREDIT RISK MANAGER

| Section 9.01. | Duties of the Master Servicer. | 142 |
| Section 9.02. | Master Servicer Fidelity Bond and Master Servicer Errors and Omissions Insurance Policy. | 143 |
| Section 9.03. | Master Servicer's Financial Statements and Related Information. | 144 |
| Section 9.04. | Power to Act; Procedures. | 144 |
| Section 9.05. | Enforcement of Servicer's and Master Servicer's Obligations. | 146 |
| Section 9.06. | Collection of Taxes, Assessments and Similar Items. | 147 |
| Section 9.07. | Termination of Servicing Agreement; Successor Servicer. | 147 |
| Section 9.08. | Master Servicer Liable for Enforcement. | 148 |
| Section 9.09. | No Contractual Relationship Between the Servicer and Trustee or Depositor. | 149 |
| Section 9.10. | Assumption of Servicing Agreement by Trustee. | 149 |
| Section 9.11. | Due-on-Sale Clauses; Assumption Agreements. | 149 |
| Section 9.12. | Release of Mortgage Files. | 150 |
| Section 9.13. | Documents, Records and Funds in Possession of Master Servicer to be Held for Trustee. | 150 |
| Section 9.14. | Representations and Warranties of the Master Servicer. | 152 |
| Section 9.15. | Opinion. | 154 |
| Section 9.16. | Standard Hazard and Flood Insurance Policies. | 154 |
| Section 9.17. | Presentment of Claims and Collection of Proceeds. | 155 |
| Section 9.18. | Maintenance of the Primary Mortgage Insurance Policies. | 155 |
| Section 9.19. | Trustee To Retain Possession of Certain Insurance Policies and Documents. | 155 |
| Section 9.20. | [Reserved] | 156 |
| Section 9.21. | Compensation to the Master Servicer. | 156 |
| Section 9.22. | REO Property. | 156 |
| Section 9.23. | Notice to the Sponsor, the Depositor and the Trustee. | 157 |
| Section 9.24. | Reports to the Trustee. | 157 |
| Section 9.25. | Assessment of Compliance and Attestation Reports. | 158 |
| Section 9.26. | Annual Statement of Compliance with Applicable Servicing Criteria. | 160 |
| Section 9.27. | Merger or Consolidation. | 160 |
| Section 9.28. | Resignation of Master Servicer. | 160 |
| Section 9.29. | Assignment or Delegation of Duties by the Master Servicer. | 160 |
| Section 9.30. | Limitation on Liability of the Master Servicer and Others. | 161 |
| Section 9.31. | Indemnification; Third-Party Claims. | 162 |
| Section 9.32. | Special Servicing of Delinquent Mortgage Loans. | 163 |
| Section 9.33. | Alternative Index. | 163 |
| Section 9.34. | Duties of the Credit Risk Manager. | 163 |
| Section 9.35. | Limitation Upon Liability of the Credit Risk Manager. | 165 |
| Section 9.36. | Indemnification by the Credit Risk Manager. | 165 |
| Section 9.37. | Removal of Credit Risk Manager. | 165 |

ARTICLE X REMIC ADMINISTRATION

| Section 10.01. | REMIC Administration. | 166 |

iii

| | | |
|---|---|---|
| Section 10.02. | Prohibited Transactions and Activities. | 169 |
| Section 10.03. | Indemnification with Respect to Certain Taxes and Loss of REMIC Status. | 169 |
| Section 10.04. | REO Property. | 169 |

## ARTICLE XI MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| Section 11.01. | Binding Nature of Agreement; Assignment. | 170 |
| Section 11.02. | Entire Agreement. | 171 |
| Section 11.03. | Amendment. | 171 |
| Section 11.04. | Voting Rights. | 173 |
| Section 11.05. | Provision of Information. | 173 |
| Section 11.06. | Governing Law. | 173 |
| Section 11.07. | Notices. | 174 |
| Section 11.08. | Severability of Provisions. | 174 |
| Section 11.09. | Indulgences; No Waivers. | 174 |
| Section 11.10. | Headings Not To Affect Interpretation. | 174 |
| Section 11.11. | Benefits of Agreement. | 174 |
| Section 11.12. | Special Notices to the Rating Agencies and any NIMS Insurer. | 175 |
| Section 11.13. | Conflicts. | 176 |
| Section 11.14. | Counterparts. | 176 |
| Section 11.15. | Transfer of Servicing. | 176 |

iv



Upper Tier REMIC: REMIC 4.

Voting Interests: The portion of the voting rights of all the Certificates that is allocated to any Certificate for purposes of the voting provisions of this Agreement. At all times during the term of this Agreement, 97.00% of all Voting Interests shall be allocated to the LIBOR Certificates. Voting Interests shall be allocated among the Classes of LIBOR Certificates based on the product of (i) 97.00% and (ii) the fraction, expressed as a percentage, the numerator of which is the aggregate Class Principal Amount of all Certificates then outstanding and the denominator of which is the Aggregate Pool Balance then outstanding. At all times during the term of this Agreement, 1% of all Voting Interests shall be allocated to each of the Class P, Class R and Class X Certificates while they remain outstanding. Voting Interests shall be allocated among the other Classes of Certificates (and among the Certificates within each such Class) in proportion to their Class Principal Amounts (or Certificate Principal Amounts) or Percentage Interests. In the case of the purchase by the Master Servicer of the Lower Tier REMIC 1 Uncertificated Regular Interests pursuant to a Section 7.01(c) Purchase Event, the LTURI-holder shall be allocated 100% of the Voting Interests and upon such purchase any provision in this Agreement which requires a vote by, a direction or notice given by, an action taken by, a request in writing by or the consent of, any percentage of the Holders of the Certificates or any Class of Certificates may be exercised by the LTURI-holder.

Wells Fargo: Wells Fargo Bank, N.A.

Section 1.02. Calculations Respecting Mortgage Loans.

Calculations required to be made pursuant to this Agreement with respect to any Mortgage Loan in the Trust Fund shall be made based upon current information as to the terms of the Mortgage Loans and reports of payments received from the Mortgagor on such Mortgage Loans and payments to be made to the Trustee as supplied to the Trustee by the Master Servicer. The Trustee shall not be required to recompute, verify or recalculate the information supplied to it by the Master Servicer, the Servicer, the Swap Counterparty, the Cap Counterparty or the Credit Risk Manager.

Section 1.03. Calculations Respecting Accrued Interest.

Accrued interest, if any, on any LIBOR Certificate shall be calculated based upon a 360-day year and the actual number of days in each Accrual Period.

ARTICLE II

DECLARATION OF TRUST;<br>ISSUANCE OF CERTIFICATES

**EXHIBIT G**

Section 2.01. Creation and Declaration of Trust Fund; Conveyance of Mortgage Loans.

(a)          Concurrently with the execution and delivery of this Agreement, the Depositor does hereby transfer, assign, set over, deposit with and otherwise convey to the Trustee, without recourse, subject to Sections 2.02, 2.04, 2.05 and 2.06, in trust, all the right, title and interest of the Depositor in and to the Mortgage Loans. Such conveyance includes, without limitation, the right to all payments of principal and interest received on or with respect to the Mortgage Loans on and after the Cut-off Date (other than payments of principal and interest due on or before such date), and all such payments due after such date but received prior to such date and intended by the related Mortgagors to be applied after such date together with all of the Depositor's right, title and interest in and to the Collection Account and all amounts from time to time credited to and the proceeds of the Collection Account, the Certificate Account and all amounts from time to time credited to and the proceeds of the Certificate Account (exclusive of investment earnings thereon), the Custodial Accounts and all amounts from time to time credited to and the proceeds of the Custodial Accounts, any Escrow Account established pursuant to Section 9.06 and any Basis Risk Reserve Fund established pursuant to Section 5.06 and all amounts from time to time credited to and the proceeds of each such account, any REO Property and the proceeds thereof, the Depositor's rights under any Insurance Policies related to the Mortgage Loans, the Depositor's security interest in any collateral pledged to secure the Mortgage Loans, including the Mortgaged Properties and any Additional Collateral, and any proceeds of the foregoing, to have and to hold, in trust; and the Trustee declares that, subject to the review provided for in Section 2.02, it has received and shall hold the Trust Fund, as trustee, in trust, for the benefit and use of the Holders of the Certificates and for the purposes and subject to the terms and conditions set forth in this Agreement, and, concurrently with such receipt, has caused to be executed, authenticated and delivered to or upon the order of the Depositor, in exchange for the Trust Fund, Certificates in the authorized denominations evidencing the entire ownership of the Trust Fund.



STRUCTURED ASSET SECURITIES CORPORATION,

PURCHASER

MORTGAGE LOAN SALE AND ASSIGNMENT AGREEMENT

Dated as of October 1, 2006

First Franklin Mortgage Loan Trust 2006-FF15
(Mortgage Pass-Through Certificates, Series 2006-FF15)

**EXHIBIT H**

TABLE OF CONTENTS

Page

ARTICLE I. CONVEYANCE OF MORTGAGE LOANS

| | | |
|---|---|---|
| Section 1.01. | Sale of Mortgage Loans. | 2 |
| Section 1.02. | Delivery of Documents. | 3 |
| Section 1.03. | Review of Documentation. | 3 |
| Section 1.04. | Representations and Warranties of the Seller. | 3 |
| Section 1.05. | Grant Clause. | 15 |
| Section 1.06. | Assignment by Depositor. | 15 |

ARTICLE II. MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| Section 2.01. | Binding Nature of Agreement; Assignment. | 15 |
| Section 2.02. | Entire Agreement. | 15 |
| Section 2.03. | Amendment. | 16 |
| Section 2.04. | Valid Assignment. | 17 |
| Section 2.05. | Governing Law. | 17 |
| Section 2.06. | Severability of Provisions. | 17 |
| Section 2.07. | Indulgences; No Waivers. | 17 |
| Section 2.08. | Headings Not to Affect Interpretation. | 17 |
| Section 2.09. | Benefits of Agreement. | 17 |
| Section 2.10. | Counterparts. | 18 |

| | |
|---|---|
| SCHEDULE A | Mortgage Loan Schedule (including Prepayment Charge Schedule) |
| SCHEDULE B | First Payment Default Mortgage Loans |
| EXHIBIT A | Certain Defined Terms |
| EXHIBIT B | Form of Terms Letter |
| EXHIBIT C | Purchase Price and Terms Letter, dated May 11, 2006 and revised as of July 31, 2006, among Lehman Brothers Bank, FSB, First Franklin Financial Corporation and National City Home Loan Services, Inc. |

i

SEC Info - First Franklin Mortgage Loan Trust 2006-FF15 - 8-K - For ...                                     http://www.secinfo.com/d12TC3.v1Dq6.c.htm

This MORTGAGE LOAN SALE AND ASSIGNMENT AGREEMENT dated as of October 1, 2006 (the *"Agreement"*), is executed by and between Lehman Brothers Holdings Inc. (*"Holdings"* or the *"Seller"*) and Structured Asset Securities Corporation (the *"Depositor"*).

All capitalized terms not defined herein or in Exhibit A attached hereto shall have the same meanings assigned to such terms in that certain trust agreement (the *"Trust Agreement"*) dated as of October 1, 2006, among the Depositor, Aurora Loan Services LLC, as master servicer (the *"Master Servicer"*), OfficeTiger Global Real Estate Services Inc., as credit risk manager and Wells Fargo Bank, N.A., as trustee (the *"Trustee"*).

### WITNESSETH:

WHEREAS, Lehman Brothers Bank, FSB (the *"Bank"*), pursuant to (A) an Amended and Restated Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank, as purchaser, and First Franklin Financial Corporation (*"FFFC"* or a *"Transferor"*) dated as of April 1, 2005, as amended (the *"Transfer Agreement"*) and (B) a Purchase Price and Terms Letter, dated May 11, 2006 and revised as of July 31, 2006, among the Bank, FFFC and National City Home Loan Services, Inc. (the *"PPTL"*), has purchased or received from FFFC certain mortgage loans, each identified on the Mortgage Loan Schedule attached hereto as Schedule A (collectively, the *"Mortgage Loans"*):

WHEREAS, pursuant to an Assignment and Assumption Agreement (the *"Assignment and Assumption Agreement"*), dated as of October 1, 2006, between the Bank, as assignor, and Holdings, as assignee, the Bank has assigned all of its right, title and interest in and to the Transfer Agreement, and certain of its rights (as described below) under each PPTL and the Mortgage Loans as listed on Schedule A, and Holdings has accepted the rights and benefits of, and assumed the obligations of the Bank under, the Transfer Agreement;

WHEREAS, Holdings is a party to the securitization servicing agreement dated as of October 1, 2006, among National City Home Loan Services, Inc., as servicer (the *"Servicer"*), the Seller and the Master Servicer, and acknowledged by the Trustee ( the *"Servicing Agreement"*) pursuant to which the Mortgage Loans will be serviced by the Servicer;

WHEREAS, the Seller desires to sell, without recourse, all of its rights, title and interest in and to the Mortgage Loans to the Depositor, assign all of its rights and interest under the Transfer Agreement, the PPTL and the Servicing Agreement relating to the Mortgage Loans referred to above, and delegate all of its obligations thereunder, to the Depositor; and

WHEREAS, the Seller and the Depositor acknowledge and agree that the Depositor will convey the Mortgage Loans on the Closing Date to a Trust Fund created pursuant to the Trust Agreement, assign all of its rights and delegate all of its obligations hereunder to the Trustee for the benefit of the Certificateholders, and that each reference herein to the Depositor is intended, unless otherwise specified, to mean the Depositor or the Trustee, as assignee, whichever is the owner of the Mortgage Loans from time to time.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Seller and the Depositor agree as follows:

ARTICLE I.

CONVEYANCE OF MORTGAGE LOANS

Section 1.01.          Sale of Mortgage Loans.

(a)          Sale of Mortgage Loans. Concurrently with the execution and delivery of this Agreement, the Seller does hereby transfer, assign, set over, deposit with and otherwise convey to the Depositor, without recourse, subject to Sections 1.03 and 1.04, all the right, title and interest of the Seller in and to the Mortgage Loans identified on Schedule A hereto, having an aggregate principal balance of approximately $2,230,267,403. Such conveyance includes, without limitation, the right to all distributions of principal and interest received on or with respect to the Mortgage Loans on and after the Cut-off Date, other than payments of principal and interest due on or before such date, and all such payments due after such date but received prior to such date and intended by the related Mortgagors to be applied after such date, all Prepayment Charges received on or with respect to the Mortgage Loans on or after the Cut-off Date, together with all of the Seller's right, title and interest in and to each related account and all amounts from time to time credited to and the proceeds of such account, any REO Property and the proceeds thereof, the Seller's rights under any Insurance Policies relating to the Mortgage Loans, the Seller's security interest in any collateral pledged to secure the Mortgage Loans, including the Mortgaged Properties, and any proceeds of the foregoing.

Concurrently with the execution and delivery of this Agreement, the Seller hereby assigns to the Depositor all of its rights and interest under (A) the Transfer Agreement (except for any rights against the Transferor under the Transfer Agreement with respect to (i) first payment date defaults or early payment date defaults or (ii) reimbursement of any amount in excess of the Purchase Price for a breach of a representation or warranty; *provided, however,* that the Seller hereby assigns to the Depositor all of its rights and interest against FFFC with respect to first payment date defaults or early payment date defaults on the Mortgage Loans set forth in Schedule B hereto (the *"First Payment Default Mortgage Loans"*), assigned to the Seller under Section 8 of the PPTL and (B) the Servicing Agreement, other than any servicing rights retained thereunder, and delegates to the Depositor all of its obligations thereunder, to the extent relating to the Mortgage Loans. The Seller and the Depositor further agree that this Agreement incorporates the terms and conditions of any assignment and assumption agreement or other assignment document required to be entered into under the Transfer Agreement (any such document, an *"Assignment Agreement"*) and that this Agreement constitutes an Assignment Agreement under the Transfer Agreement, and the Depositor hereby assumes the obligations of the assignee under such Assignment Agreement. Concurrently with the execution hereof, the Depositor tenders the purchase price set forth in that certain Terms Letter dated as of the date hereof, the form of which is attached as Exhibit B hereto (the *"Purchase Price"*). The Depositor hereby accepts such assignment and delegation, and shall be entitled to exercise all the rights of the Seller under the Transfer Agreement, the PPTL and the Servicing Agreement, other than any servicing rights thereunder, as if the Depositor had been a party to each such agreement.

(b)          Schedule of Mortgage Loans. The Depositor and the Seller have agreed upon which of the Mortgage Loans owned by the Seller are to be purchased by the Depositor pursuant to this Agreement and the Seller will prepare on or prior to the Closing Date a final schedule describing such Mortgage Loans (the *"Mortgage Loan Schedule"*). The Mortgage Loan Schedule shall conform to the requirements of the Depositor as set forth in this Agreement and to the definition of *"Mortgage Loan Schedule"* under the Trust Agreement. The Mortgage Loan Schedule is attached hereto as Schedule A.

2

SEC Info - First Franklin Mortgage Loan Trust 2006-FF15 - 8-K - For ...                    http://www.secinfo.com/d12TC3.v1Dq6.c.htm

Section 1.02.     Delivery of Documents.

(a)        In connection with such transfer and assignment of the Mortgage Loans hereunder, the Seller shall, at least three (3) Business Days prior to the Closing Date, deliver, or cause to be delivered, to the Depositor (or its designee) the documents or instruments with respect to each Mortgage Loan (each, a *"Mortgage File"*) so transferred and assigned, as specified in the Transfer Agreement or Servicing Agreement.

(b)        For Mortgage Loans (if any) that have been prepaid in full on or after the Cut-off Date and prior to the Closing Date, the Seller, in lieu of delivering the related Mortgage Files, herewith delivers to the Depositor an Officer's Certificate which shall include a statement to the effect that all amounts received in connection with such prepayment that are required to be deposited in the Collection Account maintained by the Master Servicer for such purpose have been so deposited.

Section 1.03.     Review of Documentation.

The Depositor, by execution and delivery hereof, acknowledges receipt of the Mortgage Files pertaining to the Mortgage Loans listed on the Mortgage Loan Schedule, subject to review thereof by U.S. Bank National Association, as the custodian (the *"Custodian"*) for the Depositor. The Custodian is required to review, within 45 days following the Closing Date, each Mortgage File. If in the course of such review the Custodian identifies any Material Defect, the Seller shall be obligated to cure such Material Defect or to repurchase the related Mortgage Loan from the Depositor (or, at the direction of and on behalf of the Depositor, from the Trust Fund), or to substitute a Qualifying Substitute Mortgage Loan therefor, in each case to the same extent and in the same manner as the Depositor is obligated to the Trustee and the Trust Fund under Section 2.02(c) of the Trust Agreement.

Section 1.04.     Representations and Warranties of the Seller.

(a)        The Seller hereby represents and warrants to the Depositor that as of the Closing Date:

(i)        the Seller is a corporation duly organized, validly existing and in good standing under the laws governing its creation and existence and has full corporate power and authority to own its property, carry on its business as presently conducted and enter into and perform its obligations under the Assignment and Assumption Agreement and this Agreement;

(ii)       the execution and delivery by the Seller of the Assignment and Assumption Agreement and this Agreement have been duly authorized by all necessary corporate action on the part of the Seller; neither the execution and delivery of the Assignment and Assumption Agreement and this Agreement, nor the consummation of the transactions therein or herein contemplated, nor compliance with the provisions thereof or hereof, will conflict with or result in a breach of, or constitute a default under, any of the provisions of any law, governmental rule, regulation, judgment, decree or order binding on the Seller or its properties or the certificate of incorporation or bylaws of the Seller;

3

     (iii)       the execution, delivery and performance by the Seller of the Assignment and Assumption Agreement and this Agreement and the consummation of the transactions contemplated thereby and hereby do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any state, federal or other governmental authority or agency, except such as has been obtained, given, effected or taken prior to the date hereof;

     (iv)       each of the Assignment and Assumption Agreement and this Agreement has been duly executed and delivered by the Seller and, assuming due authorization, execution and delivery by the Bank, in the case of the Assignment and Assumption Agreement, and the Depositor, in the case of this Agreement, constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its respective terms, except as such enforceability may be subject to (A) applicable bankruptcy and insolvency laws and other similar laws affecting the enforcement of the rights of creditors generally and (B) general principles of equity regardless of whether such enforcement is considered in a proceeding in equity or at law; and

     (v)       there are no actions, suits or proceedings pending or, to the knowledge of the Seller, threatened or likely to be asserted against or affecting the Seller, before or by any court, administrative agency, arbitrator or governmental body (A) with respect to any of the transactions contemplated by the Assignment and Assumption Agreement or this Agreement or (B) with respect to any other matter which in the judgment of the Seller will be determined adversely to the Seller and will if determined adversely to the Seller materially and adversely affect it or its business, assets, operations or condition, financial or otherwise, or adversely affect its ability to perform its obligations under the Assignment and Assumption Agreement or this Agreement.

     (b)      The representations and warranties of the Transferor with respect to the Mortgage Loans in the Transfer Agreement were made as of the date of the Transfer Agreement. To the extent that any fact, condition or event with respect to a Mortgage Loan constitutes a breach of both (i) a representation or warranty of the Transferor under the Transfer Agreement and (ii) a representation or warranty of the Seller under this Agreement, the sole right or remedy of the Depositor with respect to a breach by the Seller of such representation and warranty (except in the case of a breach by the Seller of the representations made by it pursuant to Sections 1.04(b)(xiii) through (xix)), shall be the right to enforce the obligations of the Transferor under any applicable representation or warranty made by it. The representations made by the Seller pursuant to Sections 1.04(b)(xiii) through (xix) shall be direct obligations of the Seller. The Depositor acknowledges and agrees that the representations and warranties of the Seller in this Section 1.04(b) (except in the case of those representations and warranties made pursuant to Sections 1.04(b)(xiii) through (xix)) are applicable only to facts, conditions or events that do not constitute a breach of any representation or warranty made by the Transferor in the Transfer Agreement. The Seller shall have no obligation or liability with respect to any breach of a representation or warranty made by it with respect to the Mortgage Loans (except in the case of those representations and warranties made by it pursuant to Sections 1.04(b)(xiii) through (xix)) if the fact, condition or event constituting such breach also constitutes a breach of a representation or warranty made by the Transferor in the Transfer Agreement, without regard to whether the Transferor fulfills its contractual obligations in respect of such representation or warranty; *provided, however*, that if the Transferor fulfills its obligations under the provisions of the Transfer Agreement by substituting for the affected Mortgage Loan a mortgage loan which is not a Qualifying Substitute Mortgage Loan, the Seller shall, in exchange for such substitute mortgage loan, provide the Depositor (a) with the applicable Purchase Price for the affected Mortgage Loan or (b) within the two-year period following the Closing Date, with a Qualified Substitute Mortgage Loan for such affected Mortgage Loan.

4

and

LEHMAN BROTHERS HOLDINGS INC.,

as Seller

and

AURORA LOAN SERVICES LLC,

as Master Servicer

---

Structured Asset Securities Corporation
*First Franklin Mortgage Loan Trust 2006-FF15*
*Mortgage Pass-Through Certificates, Series 2006-FF15*

SECURITIZATION SERVICING AGREEMENT

Dated as of <u>October 1, 2006</u>

---

**EXHIBIT I**

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS                                                                                    2

ARTICLE II. SELLER'S ENGAGEMENT OF SERVICER TO PERFORM SERVICING RESPONSIBILITIES        13

Section 2.01.   Contract for Servicing; Possession of Servicing Files.                               13
Section 2.02.   Books and Records.                                                                   14

ARTICLE III. SERVICING OF THE MORTGAGE LOANS                                                          14

Section 3.01.   Servicer to Service.                                                                 14
Section 3.02.   Collection and Liquidation of Mortgage Loans.                                        16
Section 3.03.   Establishment of and Deposits to Custodial Account.                                  17
Section 3.04.   Permitted Withdrawals From Custodial Account.                                        18
Section 3.05.   Establishment of and Deposits to Escrow Account.                                     19
Section 3.06.   Permitted Withdrawals From Escrow Account.                                           20
Section 3.07.   Notification of Adjustments.                                                         21
Section 3.08.   Reserved.                                                                            21
Section 3.09.   Payment of Taxes, Insurance and Other Charges.                                       21
Section 3.10.   Protection of Accounts.                                                              22
Section 3.11.   Maintenance of Hazard Insurance.                                                     23
Section 3.12.   Maintenance of Mortgage Impairment Insurance.                                        24
Section 3.13.   Maintenance of Fidelity Bond and Errors and Omissions Insurance.                     25
Section 3.14.   Inspections.                                                                         25
Section 3.15.   Restoration of Mortgaged Property.                                                   26
Section 3.16.   Maintenance of PMI and/or LPMI Policy; Claims.                                       26
Section 3.17.   Title, Management and Disposition of REO Property.                                   28
Section 3.18.   Real Estate Owned Reports.                                                           30
Section 3.19.   Liquidation Reports.                                                                 30
Section 3.20.   Reports of Foreclosures and Abandonments of Mortgaged Property.                      31
Section 3.21.   Prepayment Charges.                                                                  31
Section 3.22.   Compliance with Safeguarding Customer Information Requirements.                       31
Section 3.23.   Credit Reporting                                                                     31

ARTICLE IV. PAYMENTS TO MASTER SERVICER                                                               32

Section 4.01.   Remittances.                                                                         32
Section 4.02.   Statements to Master Servicer.                                                       33
Section 4.03.   Monthly Advances by Servicer.                                                        34
Section 4.04.   Due Dates Other Than the First of the Month.                                         35

i

ARTICLE V. GENERAL SERVICING PROCEDURES                                                    35

Section 5.01.   Transfers of Mortgaged Property.                                           35
Section 5.02.   Satisfaction of Mortgages and Release of Mortgage Files.                   36
Section 5.03.   Servicing Compensation.                                                    36
Section 5.04.   Report on Attestation of Compliance with Applicable Servicing Criteria.    37
Section 5.05.   Servicer Compliance Statement.                                             37
Section 5.06.   Inspection.                                                                38
Section 5.07.   Report on Assessment of Compliance with Applicable Servicing Criteria.     38
Section 5.08.   Opinion of Counsel; Servicer.                                              39

ARTICLE VI. REPRESENTATIONS, WARRANTIES AND AGREEMENTS                                      39

Section 6.01.   Representations, Warranties and Agreements of the Servicer.                 39
Section 6.02.   Remedies for Breach of Representations and Warranties of the Servicer.      41
Section 6.03.   Additional Indemnification by the Servicer.                                 42
Section 6.04.   Indemnification with Respect to Certain Taxes and Loss of REMIC Status.     43
Section 6.05.   Purchase of Distressed Mortgage Loans.                                      43
Section 6.06.   Reporting Requirements of the Commission and Indemnification.               44

ARTICLE VII. THE SERVICER                                                                   45

Section 7.01.   Merger or Consolidation of the Servicer.                                    45
Section 7.02.   Limitation on Liability of the Servicer and Others.                         45
Section 7.03.   Limitation on Resignation and Assignment by the Servicer.                   46
Section 7.04.   Subservicing Agreements and Successor Subservicer.                          47

ARTICLE VIII. TERMINATION                                                                   48

Section 8.01.   Termination for Cause.                                                      48
Section 8.02.   Termination Without Cause.                                                  51
Section 8.03.   Special Termination Events.                                                 51
Section 8.04.   Termination for Distressed Mortgage Loans.                                  53

ARTICLE IX. MISCELLANEOUS PROVISIONS                                                        54

Section 9.01.   Successor to the Servicer.                                                  54
Section 9.02.   Costs.                                                                      56
Section 9.03.   Protection of Confidential Information.                                     56
Section 9.04.   Notices.                                                                    56

ii

SEC Info - First Franklin Mortgage Loan Trust 2006-FF15 - 8-K - For ...          http://www.secinfo.com/d12TC3.v1Dq6.b.htm

| | | |
|---|---|---|
| Section 9.05. | Severability Clause. | 57 |
| Section 9.06. | No Personal Solicitation. | 57 |
| Section 9.07. | Counterparts. | 58 |
| Section 9.08. | Place of Delivery and Governing Law. | 58 |
| Section 9.09. | Further Agreements. | 58 |
| Section 9.10. | Intention of the Parties. | 58 |
| Section 9.11. | Successors and Assigns; Assignment of Servicing Agreement. | 58 |
| Section 9.12. | Assignment by the Seller. | 59 |
| Section 9.13. | Amendment. | 59 |
| Section 9.14. | Waivers. | 59 |
| Section 9.15. | Exhibits. | 59 |
| Section 9.16. | Intended Third Party Beneficiaries. | 59 |
| Section 9.17. | General Interpretive Principles. | 60 |
| Section 9.18. | Reproduction of Documents. | 60 |

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | MORTGAGE LOAN SCHEDULE |
| EXHIBIT B | CUSTODIAL ACCOUNT LETTER AGREEMENT |
| EXHIBIT C | ESCROW ACCOUNT LETTER AGREEMENT |
| EXHIBIT D-1 | FORM OF MONTHLY REMITTANCE ADVICE |
| EXHIBIT D-2 | STANDARD LAYOUT FOR MONTHLY DEFAULTED LOAN REPORT |
| EXHIBIT D-3 | FORM OF LOAN LOSS REPORT |
| EXHIBIT E | FORM OF CERTIFICATION TO BE PROVIDED TO THE DEPOSITOR, THE TRUSTEE AND THE MASTER SERVICER BY THE SERVICER |
| EXHIBIT F | FFMLT 2006-FF15 TRUST AGREEMENT |
| EXHIBIT G | FANNIE MAE GUIDE NO. 95-19 |
| EXHIBIT H | [RESERVED] |
| EXHIBIT I | SERVICING CRITERIA TO BE ADDRESSED IN REPORT ON ASSESSMENT OF COMPLIANCE |
| EXHIBIT J | TRANSACTION PARTIES |
| EXHIBIT K | FORM OF ANNUAL OFFICER'S CERTIFICATE |

This SECURITIZATION SERVICING AGREEMENT (this *"Agreement"*), entered into as of the 1st day of October, 2006, by and among Lehman Brothers Holdings Inc., a Delaware corporation (the *"Seller"*) and National City Home Loan Services, Inc., a Delaware corporation (*"Servicer"*), Aurora Loan Services LLC, as master servicer (the *"Master Servicer"*) and acknowledged by Wells Fargo Bank, N.A., solely in its capacity as trustee (the *"Trustee"*) under the Trust Agreement (as defined herein), recites and provides as follows:

### WITNESSETH:

WHEREAS, the Servicer and Lehman Brothers Bank, FSB (the *"Bank"*) are parties to a Flow Servicing Agreement dated April 1, 2005, as amended, (the *"Flow Servicing Agreement"*), pursuant to which the Servicer services certain residential, adjustable and fixed rate mortgage loans identified on Exhibit A hereto (the *"Mortgage Loans"*) which were acquired by the Bank from First Franklin Financial Corporation, (the *"Mortgage Loan Seller"*) pursuant to the terms of a Flow Mortgage Purchase and Warranties Agreement, dated as of April 1, 2005, as amended between the Bank and the Mortgage Loan Seller.

WHEREAS, pursuant to an Assignment and Assumption Agreement, dated as of October 1, 2006 (the *"Assignment Agreement"*), the Seller acquired from the Bank all of the Bank's right, title and interest in and to the Mortgage Loans and assumed for the benefit of the Mortgage Loan Seller, the Servicer and the Bank all the rights and obligations of the Bank as owner of the Mortgage Loans.

WHEREAS, on the Closing Date, the Seller intends to convey the Mortgage Loans on a servicing-retained basis to Structured Asset Securities Corporation (the *"Depositor"*), which in turn will convey the Mortgage Loans to the Trustee under a trust agreement dated as of October 1, 2006 (the *"Trust Agreement"*), among the Trustee, the Depositor, the Master Servicer and Office Tiger Global Real Estate Services, Inc., (f/k/a the MortgageRamp, LLC), as credit risk manager (the *"Credit Risk Manager"*);

WHEREAS, the Seller desires that the Servicer service the Mortgage Loans pursuant to this Agreement, and the Servicer has agreed to do so, subject to the right of the Seller and of the Master Servicer to terminate the rights and obligations of the Servicer hereunder at any time and to the other conditions set forth herein;

WHEREAS, the Seller and the Servicer agree that the provisions of the Flow Servicing Agreement shall not apply to such related Mortgage Loans for so long as such related Mortgage Loans remain subject to the provisions of the Trust Agreement;

WHEREAS, the Master Servicer shall be obligated under the Trust Agreement, among other things, to supervise the servicing of the Mortgage Loans on behalf of the Trustee, and shall have the right, under certain circumstances, to terminate the rights and obligations of the Servicer under this Servicing Agreement upon the occurrence and continuance of an Event of Default as provided herein;

1

WHEREAS, multiple classes of certificates (the *"Certificates"*), including the Class P and the Class X Certificates, will be issued on the Closing Date pursuant to the Trust Agreement and Lehman Brothers Inc. or a nominee thereof is expected to be the initial registered holder of the Class P and Class X Certificates;

WHEREAS, subsequent to the Closing Date, Lehman Brothers Inc. intends to convey all of its rights, title and interest in and to the Class P and the Class X Certificates and all payments and all other proceeds received thereunder to an owner trust or other special purpose entity in which it will hold the sole equity interest, which owner trust or special purpose entity will issue net interest margin securities (*"NIM Securities"*) through an indenture trust, such NIM Securities secured, in part, by the payments on such Certificates (the *"NIMS Transaction"*);

WHEREAS, one or more insurers (collectively, the *"NIMS Insurer"*) may each issue one or more insurance policies guaranteeing certain payments under the NIM Securities to be issued pursuant to the indenture in the NIMS Transaction;

WHEREAS, in the event there may be two or more individual insurers it is intended that the rights extended to the NIMS Insurer pursuant to this Agreement be allocated among two or more individual insurers that issue insurance policies in connection with the NIMS Transaction through a NIMS Insurance Agreement by and among such insurers and the parties hereto;

WHEREAS, the Seller and the Servicer acknowledge and agree that the Seller will assign all of its rights and delegate all of its obligations hereunder (excluding the Seller's rights to terminate the rights and obligations of the Servicer hereunder and the Seller's obligations pursuant to Section 9.02, all of which rights and obligations will remain with the Seller or be delegated to or assumed by the Master Servicer) to the Trustee, and that each reference herein to the Seller is intended, unless otherwise specified, to mean the Seller or the Trustee, as assignee, whichever is the owner of the Mortgage Loans from time to time;

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Seller, the Master Servicer and the Servicer hereby agree as follows:

ARTICLE I.

DEFINITIONS

The following terms are defined as follows:

Accepted Servicing Practices: With respect to any Mortgage Loan, those mortgage servicing practices (i) of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loans in the jurisdiction where the related Mortgaged Property is located and (ii) in accordance with applicable state, local and federal laws, rules and regulations.

2

Adjustable Rate Mortgage Loan: A Mortgage Loan for which the related Mortgage Note provides for adjustment of the applicable Mortgage Interest Rate according to an index.

Agreement: This Securitization Servicing Agreement and all amendments hereof and supplements hereto.

Ancillary Income: All income derived from the Mortgage Loans, excluding the Servicing Fee and Prepayment Charges attributable to the Mortgage Loans, including but not limited to, interest received on funds deposited in the Custodial Account or any Escrow Account, late charges, fees received with respect to checks or bank drafts returned by the related bank for non-sufficient funds, assumption fees, optional insurance administrative fees and all other incidental fees and charges. The Servicer shall retain all Ancillary Income to the extent not required to be deposited into the Custodial Account.

Assignment of Mortgage: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer of the Mortgage to the party indicated therein or if the related Mortgage has been recorded in the name of MERS or its designee, such actions as are necessary to cause the Trustee or its designee to be shown as the owner of the related Mortgage on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

Business Day: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the States of New York, Colorado, Pennsylvania or Massachusetts are authorized or obligated by law or executive order to be closed.

Certificateholder: The meaning set forth in the Trust Agreement.

Certificates: Any or all of the Certificates issued pursuant to the Trust Agreement.

Closing Date: October 30, 2006.

Code: The Internal Revenue Code of 1986, as it may be amended from time to time or any successor statute thereto, and applicable U.S. Department of the Treasury regulations issued pursuant thereto.

Commission: The United States Securities and Exchange Commission.

Condemnation Proceeds: All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan documents.

3

Custodial Account: The separate account or accounts created and maintained pursuant to Section 3.03.

Custodial Agreement: The custodial agreement relating to the custody of certain of the Mortgage Loans, between the related Custodian and the Trustee, as acknowledged by the Depositor, the Master Servicer and the Servicer, and dated as of October 1, 2006.

Custodian: U.S Bank National Association and its successors and assigns.

Cut-off Date: October 1, 2006.

Depositor: Structured Asset Securities Corporation, a Delaware corporation, or any successor in interest.

Determination Date: With respect to each Remittance Date, the 15th day of the month in which such Remittance Date occurs, or, if such 15th day is not a Business Day, the next succeeding Business Day.

Distressed Mortgage Loan: As of any Determination Date, any Mortgage Loan that is delinquent in payment for a period of ninety (90) days or more, without giving effect to any grace period permitted by the related Mortgage Loan, or for which the Servicer or Trustee has accepted a deed in lieu of foreclosure.

Distribution Date: Commencing in November 2006, the 25th day of each month or, if such day is not a Business Day, the next succeeding Business Day).

Due Date: The day of the calendar month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace. Pursuant to Section 4.04, with respect to any Mortgage Loan for which payment from the Mortgagor is due on a day other than the first day of the month, such Mortgage Loan will be treated as if the Monthly Payment is due on the first day of the immediately succeeding month.

Due Period: With respect to each Remittance Date, the period commencing on the second day of the month immediately preceding the month of the Remittance Date and ending on the first day of the month of the Remittance Date.

Eligible Deposit Account: An account that is maintained with a federal or state-chartered depository institution or trust company that complies with the definition of Eligible Institution.

Eligible Institution: Any of the following:

(i)          an institution whose:

4

(A)      commercial paper, short-term debt obligations, or other short-term deposits are rated at least "A-1+" or long-term unsecured debt obligations are rated at least "AA-" by S&P, if the amounts on deposit are to be held in the account for no more than 365 days; or

(B)      commercial paper, short-term debt obligations, demand deposits, or other short-term deposits are rated at least "A-2" by S&P, if the amounts on deposit are to be held in the account for no more than 30 days and are not intended to be used as credit enhancement. Upon the loss of the required rating set forth in this clause (i), the accounts shall be transferred immediately to accounts which have the required rating. Furthermore, commingling by the Servicer is acceptable at the A-2 rating level if the Servicer is a bank, thrift or depository and provided the Servicer has the capability to immediately segregate funds and commence remittance to an Eligible Deposit Account upon a downgrade; or

(ii)      the corporate trust department of a federal depository institution or state-chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the U.S. Code of Federal Regulation Section 9.10(b), which, in either case, has corporate trust powers and is acting in its fiduciary capacity.

Eligible Investments: Any one or more of the obligations and securities listed below which investment provides for a date of maturity not later than three days prior to the Remittance Date in each month:

(iii)      direct obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America ("Direct Obligations");

(iv)      federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company (including U.S. subsidiaries of foreign depositories, the Trustee or any agent of the Trustee, acting in its respective commercial capacity) incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal or state banking authorities, so long as at the time of such investment or the contractual commitment providing for such investment the commercial paper or other short-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the commercial paper or other short-term debt or deposit obligations of such holding company or deposit institution, as the case may be) have been rated by each Rating Agency in its highest short-term rating category or one of its two highest long-term rating categories;

(v)      repurchase agreements collateralized by Direct Obligations or securities guaranteed by Fannie Mae or Freddie Mac with any registered broker/dealer subject to Securities Investors' Protection Corporation jurisdiction or any commercial bank insured by the FDIC, if such broker/dealer or bank has an uninsured, unsecured and unguaranteed obligation rated by each Rating Agency in its highest short-term rating category;

5

*SEC Info*   Home   Search   My Interests   Help   Sign In   *Please Sign In*

# First Franklin Mortgage Loan Trust 2006-FF15 · 8-K · For 10/30/06 · EX-99.3

**Filed On 11/13/06 6:00pm ET  ·  SEC File 333-133985-22  ·  Accession Number 1144204-6-46921**

| Find: | | in | this entire Filing. | Show | Docs searched | and | every "hit". |

Help...  *Wildcards:* **?** (any letter), **\*** (many). *Logic:* for Docs: **&** (and), **|** (or); for Text: **|** (anywhere), **"(&)"** (near).

| As Of | Filer | Filing | As/For/On | Docs:Pgs | Issue |
|---|---|---|---|---|---|
| 11/14/06 | First Franklin Mortgag..2006-FF15 | 8-K{8,9} | 10/30/06 | 6:531 | |

### Current Report · Form 8-K
### Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 8-K | Current Report | HTML | 29K |
| 2: EX-4.1 | Instrument Defining the Rights of Security Holders | HTML | 1,342K |
| 3: EX-99.1 | Miscellaneous Exhibit | HTML | 114K |
| 4: EX-99.2 | Miscellaneous Exhibit | HTML | 516K |
| 5: EX-99.3 | Miscellaneous Exhibit | HTML | 281K |
| 6: EX-99.4 | Miscellaneous Exhibit | HTML | 279K |

### EX-99.3 · Miscellaneous Exhibit

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

Sponsored Ads...

**Annuity Scam Alert**
What You Must Know About
Annuities. Do Not Get Ripped Off.
www.annuity.com

**Pay Roll Deduction**
Paychecks & taxes calculated. Save
hours. Easy payroll online.
PayCycle.com

**Repo Homes for $10,000**
Foreclosed Repos at Huge Savings.
Pay $1 to Get Listings in Your Area
www.HUDforeclosed.com

Ads by Google

(Multicurrency - Cross Border)



# ISDA.

International Swaps and Derivatives Association, Inc.

## MASTER AGREEMENT        **EXHIBIT J**

dated as of October 30, 2006

|  | | SUPPLEMENTAL INTEREST TRUST, FIRST FRANKLIN MORTGAGE LOAN TRUST |
|---|---|---|
| **IXIS FINANCIAL PRODUCTS INC.** | and | **2006-FF15** |

have entered and/or anticipate entering into one or more transactions (each a *"Transaction"*) that are or will be governed by this Master Agreement, which includes the schedule (the *"Schedule"*), and the documents and other confirming evidence (each a *"Confirmation"*) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

**1.      Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this *"Agreement"*), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      General Conditions.

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

   (i)      in the same currency; and

   (ii)     in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax*.

   (i)      *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

      (1)      promptly notify the other party ("Y") of such requirement;

      (2)      pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

      (3)      promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

      (4)      if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

         (A)      the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

SEC Info - First Franklin Mortgage Loan Trust 2006-FF15 - 8-K - For ...        http://www.secinfo.com/d12TC3.v1Dq6.a.htm

2

(B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)     *Liability.* If: —

(1)     X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)     X does not so deduct or withhold; and

(3) ·    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)     *Default Interest, Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.     **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)     *Basic Representations.*

(i)     *Status.* It is duly organized and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)     *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)     *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)     *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

SEC Info - First Franklin Mortgage Loan Trust 2006-FF15 - 8-K - For ...                    http://www.secinfo.com/d12TC3.v1Dq6.a.htm

3

(v)     *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)     *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support
Document to which it is a party.

(c)     *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.     Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)     any other documents specified in the Schedule or any Confirmation, and

    (iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

SEC Info - First Franklin Mortgage Loan Trust 2006-FF15 - 8-K - For ...          http://www.secinfo.com/d12TC3.v1Dq6.a.htm

4

(c)      *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located (*"Stamp Tax Jurisdiction"*) and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.      Events of Default and Termination Events**

(a)      *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an *"Event of Default"*) with respect to such party:—

   (i)      *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

   (ii)     *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

   (iii)    *Credit Support Default*.

      (1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

      (2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

      (3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document:

   (iv)     *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

   (v)      *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any

payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

5

(vi)     *Cross Default.* If *"Cross Default"* is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)    *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:
—

(1)     is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)   *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1)     the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)     the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

***SEC Info***   Home   Search   My Interests   Help   Sign In   *Please Sign In*

# First Franklin Mortgage Loan Trust 2006-FF15 · 8-K · For 10/30/06 · EX-99.3

**Filed On 11/13/06 6:00pm ET · SEC File 333-133985-22 · Accession Number 1144204-6-46921**

[Find] [                    ] in [this entire Filing.] Show [Docs searched] and [every "hit".]
Help... *Wildcards:* **?** (any letter), **\*** (many). *Logic:* for Docs: **&** (and), **|** (or); for Text: **|** (anywhere), **"(&)"** (near).

| As Of | Filer | Filing | As/For/On | Docs:Pgs | Issue |
|---|---|---|---|---|---|
| 11/14/06 | First Franklin Mortgag..2006-FF15 | 8-K(8,9) | 10/30/06 | 6:531 | |

### Current Report · Form 8-K
### Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 8-K | Current Report | HTML | 29K |
| 2: EX-4.1 | Instrument Defining the Rights of Security Holders | HTML | 1,342K |
| 3: EX-99.1 | Miscellaneous Exhibit | HTML | 114K |
| 4: EX-99.2 | Miscellaneous Exhibit | HTML | 516K |
| 5: EX-99.3 | Miscellaneous Exhibit | HTML | 281K |
| 6: EX-99.4 | Miscellaneous Exhibit | HTML | 279K |

### EX-99.3 · Miscellaneous Exhibit

*This is an EDGAR HTML document rendered as filed. [ Alternative Formats ]*

[ Sponsored Ads... ]

**Annuity Scam Alert**
What You Must Know About
Annuities. Do Not Get Ripped Off.
www.annuity.com

**Pay Roll Deduction**
Paychecks & taxes calculated. Save
hours. Easy payroll online.
PayCycle.com

**Repo Homes for $10,000**
Foreclosed Repos at Huge Savings.
Pay $1 to Get Listings in Your Area
www.HUDforeclosed.com

Ads by Google

(Multicurrency - Cross Border)



# ISDA.

International Swaps and Derivatives Association, Inc.

## MASTER AGREEMENT

**EXHIBIT J**

dated as of October 30, 2006

IXIS FINANCIAL PRODUCTS INC.                    and

SUPPLEMENTAL INTEREST TRUST, FIRST
FRANKLIN MORTGAGE LOAN TRUST
2006-FF15

have entered and/or anticipate entering into one or more transactions (each a *"Transaction"*) that are or will be governed by this Master Agreement, which includes the schedule (the *"Schedule"*), and the documents and other confirming evidence (each a *"Confirmation"*) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.      **Interpretation**

(a)      *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.      .

(c)      *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this *"Agreement"*), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      General Conditions.

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)      *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)      *Netting.* If on any date amounts would otherwise be payable:—

　　　　(i)      in the same currency; and

　　　　(ii)      in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)      *Deduction or Withholding for Tax.*

　　　　(i)      *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

　　　　　　(1)      promptly notify the other party ("Y") of such requirement;

　　　　　　(2)      pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

　　　　　　(3)      promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

　　　　　　(4)      if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

　　　　　　　　(A)      the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

SEC Info - First Franklin Mortgage Loan Trust 2006-FF15 - 8-K - For ...                    http://www.secinfo.com/d12TC3.v1Dq6.a.htm

2

(B)      the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)      *Liability.* If: —

(1)      X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)      X does not so deduct or withhold; and

(3)      a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)      *Default Interest, Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.      **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)      *Basic Representations.*

(i)      *Status.* It is duly organized and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)      *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)      *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)      *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

3

(v)      *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)      *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support
Document to which it is a party.

(c)      *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.      **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)        any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)       any other documents specified in the Schedule or any Confirmation, and

(iii)      upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

4

(c)      *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located (*"Stamp Tax Jurisdiction"*) and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.      Events of Default and Termination Events**

(a)      *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an *"Event of Default"*) with respect to such party:—

   (i)      *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

   (ii)      *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

   (iii)      *Credit Support Default.*

      (1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

      (2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

      (3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

   (iv)      *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

   (v)      *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any

payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

5

(vi)     *Cross Default.* If *"Cross Default"* is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)    *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:
—

(1)     is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)   *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1)     the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)     the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

DOC# 201003749

PREPARED BY:
Law Offices of Shapiro & Kirsch
6055 Primacy Pkwy. Suite 410
Memphis, TN 38119

## MORTGAGE NOTICE OF DEFAULT AND INTENTION TO SELL

### YOU MAY LOSE YOUR PROPERTY IF YOU DO NOT TAKE IMMEDIATE ACTION

*IF YOUR PROPERTY IS SOLD YOU WILL REMAIN LIABLE FOR ANY DEFICIENCY AND AN ACTION TO COLLECT THE DEFICIENCY MAY BE BROUGHT AGAINST YOU*

NOTICE IS HEREBY GIVEN that on June 14, 2010 at 11:00AM, the following real property will be sold at public auction at the FRONT door of the Lonoke County Courthouse, or, if there is no area commonly known as the FRONT door, then the sale will be held at the place at the county courthouse where foreclosure sales are customarily advertised and conducted, Lonoke Arkansas, to the highest bidder. The sale will extinguish all subordinate interests that may exist, including existing subordinate lienholders or previous owners. The highest bidder shall pay the bid by certified funds the day of the sale and will be responsible for all transfer taxes. The purchaser will also be responsible for any unpaid property taxes, prior liens and/or encumbrances of record. The purchaser will further be responsible for all actions that may be necessary to remove any tenants that may claim an interest in the real property as well as any action that may be necessary to obtain title to any mobile home located on the subject property that is not permanently affixed.

WHEREAS, on August 3, 2006, Harvey E. Beech and Faith Beech, Husband and Wife executed a Mortgage in favor of First Franklin A Division of National City Bank of Indiana, which was recorded on August 25, 2006 in the real estate records of Lonoke County, AR in instrument number 200611768.

WHEREAS, Wells Fargo Bank, National Association, as trustee for the holders of the First Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15 is now the present title holder of property secured under the Mortgage located in Lonoke County, Arkansas more particularly described as:

Described property located in part of the Northwest 1/4 of the Southwest 1/4 Section 11, T4N, R10W, more particularly described as follows:

Beginning at the Northeast corner of the Northeast corner of the Northwest 1/4 Southwest 1/4, Section 11; thence West 438.0 feet to the point of beginning; thence South 587.06 feet; thence West 171.0 feet; thence South 250.0 feet; thence West 200 feet; thence North 837.06 feet; thence East 371.0 feet to the point of beginning.

Street Address: 121 Deer Creek Drive, Cabot, AR 72023.

09-018838

The street address of the above described property is believed to be 121 Deer Creek Drive, Cabot, AR 72023, but such street address is not a part of the legal description of the property sold herein and in the event of any discrepancy, the legal description herein shall control; and

WHEREAS, default has occurred in the payment of said indebtedness, therefore the entire balance is wholly due; and the owner and holder of the debt has requested that the undersigned sell the property to satisfy said indebtedness; and

*Exhibit K*

CERTIFICATE OF RECORD
DOC# RECORDING201003749
04/14/2010        01:27:27 PM
Filed & Recorded in Official Records of
LONOKE COUNTY
DEBORAH OGLESBY CIRCUIT CLERK
Fees $28.00
BY _T. Freeman_      D.C.

WHEREAS, pursuant to Arkansas Code Annotated §18-50-102, the undersigned is the appointed attorney-in-fact of the mortgagee and is acting on behalf of and with the consent and authority of the mortgagee who is exercising its power of sale under Arkansas Code Annotated §18-50-115 which implies a power of sale in every mortgage of real property situated in this state that is duly acknowledged and recorded.

WITNESS my hand this 14th day of April, 2010.

THIS OFFICE IS A DEBT COLLECTOR.
THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

By: _____
D. Denise Griffin
Attorney for Wells Fargo Bank, National Association, as trustee for the holders of the First Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15
Shapiro & Kirsch, L.L.P.
6055 Primacy Parkway - Ste. 410, Memphis, TN 38119
901-767-5566

STATE OF TENNESSEE)
                  )ss
COUNTY OF SHELBY)

On this 14th day of April, 2010, before me, the undersigned officer, a Notary Public in and for said County and State, on this day personally appeared D. Denise Griffin, of Shapiro & Kirsch, L.L.P., known to me to be the person whose name is subscribed in the foregoing instrument as Attorney in Fact for Wells Fargo Bank, National Association, as trustee for the holders of the First Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15 and acknowledged that she executed the same as the act of her principal, for the purpose therein expressed and contained.

_____
Notary Public

My Commission Expires:
2/01/2012
09-018838

**Exhibit L**

Harvey Beech
121 Deer Creek Dr.
Cabot, AR 72023

Shapiro and Kirsch
6055 Primacy Parkway, Suite 410
Memphis, TN 38119

Date April 21, 2010
RE: Mortgagees Notice of Default and Intention to sale on June 14, 2010

## REQUEST FOR DEBT VALIDATION

To Whom it May Concern,

I received the notice of default and intention to sale that you filed on April 14, 2010. I have been sending qualified written requests to Select Portfolio since September 2009.

I do not know who Wells fargo is and have never tendered a payment to them.

This is a Request for Validation of Debt. I am not refusing to pay, however, I need the information set forth in this request that I can make an Offer to Settle this account. With that said, please answer the following questions related to this disputed account and return them to me within Ten (10) days (Plus Two (2) days for mailing) of receipt of this request. In the event you should need more time to answer and validate this disputed debt, the undersigned will grant an additional Five (5) days (Plus two (2) days for mailing) predicated upon your written request for said extension being made prior to the expiration of the allotted time for answering.

If you fail to respond and continue to collect, I will file a lawsuit in Lonoke County Circuit Court and you will be responsible for my court cost and attorney fees.

1. Who is the Lender that is owed the debt

2. What is the Lender phone number and address.

3. Please explain how they received the loan and what they paid for it.

4. Is there an assignment of mortgage recorded in the real estate records?

5. Please explain how your office obtained the file?

6. Did the current mortgagee of the mortgage give you authorization to sell the property?

7. Please explain how the debt is in default what payments were made and what payments were missed.

8. Do you have the original promissory note in your office? If so can I set up a time to view it?

9. Send certified copy's of the promissory note, mortgage, and transfers of this disputed debt.

Upon failure or refusal of collector to validate this collection action, demand for payment on mortgage, collector agrees to waive all claims against the debtor named herein and agrees to pay debtor for all costs and attorney fees involved in exhaustion of administrative remedies and/or defending this action.

   Please return these completed questions and attach all assignment or other transfer agreements that would establish your right to collect this debt.  Your claim cannot be considered if ANY portion of this request for validation of debt is not completed and returned with the required documents.  This is a request for validation made pursuant to the Fair Debt Collection Practices Act.  If you do not respond as required by law and within the time granted, you will have stipulated that you have failed to state a claim.


Sincerely,


Harvey Beech

Gerald M. Shapiro
Admitted in Illinois & Florida
Joe M. Kirsch
Admitted in Tennessee
Sharon N. Fewell
Admitted in Arkansas & Tennessee
D. Denise Griffin
Admitted in Arkansas & Tennessee
Ashley M. Jones
Admitted in Arkansas & Tennessee


# Shapiro and Kirsch, LLP
## ──── ATTORNEYS AT LAW ────

Renee G. Kammer
Admitted in Tennessee
Bonnie B. Culp
Admitted in Tennessee
Robert Schneider
Admitted in Tennessee
Matthew McKay
Admitted in Tennessee & Arkansas
Matthew W. Graves
Admitted in Arkansas Federal
Courts, Kentucky & Tennessee
Jeremy Lipford, Director of
Operations

April 28, 2010

Harvey E. Beech                                    VIA CERTIFIED MAIL: 71603901984893947882
121 Deer Creek Drive
Cabot, AR 72023

RE:     Select Portfolio Servicing, Inc./ 0011589421
        Property Address:   121 Deer Creek Drive, Cabot, AR 72023
        S&K File No.: 09-018838

Dear Harvey E. Beech:

Our office is in receipt of your correspondence dated April 21, 2010, which was determined to be a debt
validation request.  In response, please find enclosed a copy of the following:

- Mortgage, reflecting the original creditor, First Franklin A Division of National City Bank
  of Indiana.
- Copy of Note
- Payment History has been requested and will be forwarded to you immediately upon
  receipt.

You may wish to contact your mortgage company at 888-818-6032 to discuss your options. Should you have
any further questions or concerns, you may contact the Law Office of Shapiro & Kirsch, LLP at the below
address or by phone at (901) 767-5566.

To the extent that your correspondence is intended to be a "Qualified Written Request" under the Real
Estate Settlement Procedures Act, please be advised that this Firm is not an agent of your servicer for
purposes of receiving and/or responding to such inquiries. All "Qualified Written Requests" should be
directed to your servicer at the following address:

                Select Portfolio Servicing, Inc.
                3815 South West Temple
                Salt Lake City, Utah 84115

Sincerely,

*Exhibit*
*M*

Exhibit N

DOC# 200909705

## MORTGAGEE S ACCELERATION OF MATURITY AND
## LIMITED POWER OF ATTORNEY FOR NON-JUDICIAL SALE

WHEREAS, the undersigned is the present owner and holder of a Note and Mortgage executed by Harvey E. Beech and Faith Beech, Husband and Wife to First Franklin, a Division of Nat. City Bank of IN dated August 3, 2006 and being of record in Instrument Number 200611768 in the real estate records of Lonoke County, Arkansas.

WHEREAS, default has occurred in the payment of the indebtedness evidenced by said Mortgage and therefore the Mortgagee has elected to exercise its power of sale pursuant to Arkansas Code Annotated §18-50-115.

THEREFORE, the undersigned does hereby declare immediately due and payable the total amount of the unmatured principal and accrued interest owing under the Note and all indebtedness secured by the Mortgage.

THEREFORE, pursuant to Ark. Code Annotated §18-50-101 et seq as Amended under Act 983 of 1999 on March 31, 1999 the undersigned does hereby request and appoint D. Denise Griffin and/or Ashley M. Jones of Shapiro & Kirsch, L.L.P., Attorneys at Law, to act on, and with the consent, powers, duties, rights and authority of the Mortgagee, who is exercising its power of sale pursuant to Ark. Code Annotated §18-50-115, including selling the real property as described in the Mortgage in accordance with its terms and provisions; and, further the undersigned does hereby ratify and confirm any and all actions taken on its behalf by the attorney-in-fact herein prior to the recording of this power of sale.

IN WITNESS WHEREOF, the undersigned has executed these presents this _14_ day of _August_, 2009

Holder:   **Select Portfolio Servicing, Inc. as Attorney in Fact**
Wells Fargo Bank, National Association, as trustee for the holders of the First Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through Certificates, Series 2006-FF15

ATTEST:

By: _____

Title:   **PAUL LANGFORD**
Document Control Officer

Exhibit N

CERTIFICATE OF RECORD
DOC# RECORDING200909705
08/21/2009          01:13:43 PM
Filed & Recorded in Official Records of
LONOKE COUNTY
DEBORAH OGLESBY CIRCUIT CLERK
Fees $28.00
BY_____ D.C.

By: _____

Title: **MERLOBEL CUSTODIO**
~~Document Control Officer~~

STATE OF   Utah              )
                                           ) ss
COUNTY OF  Salt Lake     )

On this 14 day of August_____, 2009, before me, the undersigned officer, a Notary
Public in and for said County and State, on this day personally appeared
**PAUL LANGFORD**        and   ~~Document Control Officer~~ known to me to be the person
whose ~~MERLOBEL CUSTODIO~~ foregoing instrument as Document Officer / Select Portfolio Servicing, Inc. as Attorney in Fact
and    ~~Document Control Officer~~ of Wells Fargo Bank, National Association, as trustee for
the holders of the First Franklin Mortgage Loan Trust 2006-FF15 Mortgage Pass-Through
Certificates, Series 2006-FF15, being authorized so to do, and acknowledged that they executed
the same for the purpose and consideration therein expressed and contained, by signing their
names as such officers.

Notary Public

My Commission Expires:
07-20-2013

PREPARED BY:
Shapiro & Kirsch, L.L.P.
6055 Primacy Parkway, Ste. 410
Memphis, TN 38119
901-767-5566
S&K No.: 09-018838

MICHAEL DOUGLAS BROOKS
NOTARY PUBLIC·STATE OF UTAH
COMMISSION# 579591
COMM. EXP. 07-20-2013



Harvey E. Beech
121 Deer Creek Drive
Cabot, AR 72023



May 11, 2010

Select Portfolio Servicing Inc.
P.O. Box 65250
Salt Lake City, UT 84165-0250

RE: Account No.: 0011589421

To Whom It May Concern:
I hereby request information about the fees, costs, and escrow accounting of my loan.
This letter is a qualified written request (QWR), pursuant to the Real Estate Settlement
and Procedures Act (RESPA), 12 U.S.C. 2605(e)

This information I request as part of this QWR is as follows:

1) The current interest rate on this account
2) The adjustment dates of each interest rate adjustment on this account, with the
   corresponding adjustment amount
3) Who the current holder of the mortgage/deed of trust is, and their mailing address
   for process of service, along with a current telephone number.
4) Who the current holder of the note is, and their mailing address for process of
   service, along with a current telephone number
5) The date that the current holder acquired this mortgage and from whom it was
   acquired from.
6) The date your firm began servicing the loan
7) The Previous servicer of the loan
8) The monthly principal and interest payments, and monthly escrow payments
   received from the date of the loan's closing to the date of this QWR;
9) A complete payment history of how those payments were applied, including the
   amounts applied to principal, interest, escrow, and other charges;
10) The total amount due of any unpaid principal, interest, escrow charges, and other
    charges due as of the date of this letter. Please separately and identify each
    amount due;
11) The total amount of principal paid on the account up to the date of this letter.
12) The payment dates, purposes of payment and recipient of any and all foreclosure
    fees and costs that have been charged to my account;
13) A breakdown of the current escrow charges showing how it is calculated and the
    reasons for any increase within the last 24 months;
14) A breakdown of any shortage, deficiency or surplus in our escrow account over
    the past three years

1

15) A breakdown of all charges accrued on the account since the date of closing, that includes but is not limited by, late charges appraisal fees, property inspection fees, forced placed insurance charges, legal fees, and recoverable corporate advances.
16) A statement indicating which covenants of the mortgage and/or note authorized each charge.
17) Please provide a copy of all appraisals, property inspections, and risk assessments completed for this account.
18) Please provide a copy of all servicing agreements pertaining to this account.
19) Please provide a copy of all servicing agreements (master, sub-servicing, contingency, specialty, and back-up) pertaining to this account.
20) Please provide a copy of all written loss-mitigation rules and work-out procedures for this account.
21) Please provide a copy of all manuals pertaining to the servicing of this account.
22) Please provide a copy of the LSAMS Transaction History Report for this account, and include a description of all fee codes.
23) If this account is registered with MERS, state its MIN number.
24) A statement indicating the amount to pay this loan off in full as June 10, 2010

I hereby dispute all the late fees, charges, inspection fees, property appraisal fees, forced placed insurance charges, legal fees, and corporate advances charged to this account. Additionally, I believe my account is in error for the following reasons:[My note is defective. It says I agree to pay back $188,000. I only financed $182,942.56. The seller paid 5057.42 in closing cost. I have attached a copy of the Truth in Lending disclosure]. Pursuant to 12 U.S.C. 2605(e), you are hereby notified that placing any negative coding on my credit report before responding to this letter is a violation of RESPA and the FCRA. Your organization will be subject to civil liability if negative coding appears for this account before a response to this QWR is issued to me.

Please provide me confirmation that you have received this QWR within 20 days, as required under 12 U.S.C. 2605(e). Thereafter, please respond to these questions within 60 days of receipt of this letter, also as required under 12 U.S.C. 1605(e)

Regards,

Harvey E. Beech

Cc: Shaprio and Kirsh, LLP
   6055 Primacy Parkway, Suite 410
   Memphis, Tennessee 38119

2



U.S. POSTAGE
LITTLE ROCK, AR
72201
MAY FRONT 10
$10.00
0006898-05

1006   72201

Select Portfolio Services
Componaate Service Co.
300 S. Spring St. Suite 960
Little Rock, AR 72201

BEECH
121 Deer Cuk. Ro.
Cabot AR 72023



CERTIFIED MAIL

7010 0780 0001 9179 7432

2

## Adrienne L. Jung

**From:** Don Eilbott [deilbott@jacknelsonjones.com]
**Sent:** Sunday, June 06, 2010 3:11 PM
**To:** Adrienne L. Jung
**Cc:** Judy Simmons Henry; John Helbling
**Subject:** RE: Beech- strategy/joint defense

I agree

### DON A. EILBOTT
2800 CANTRELL ROAD, SUITE 500
POST OFFICE BOX 23870
LITTLE ROCK, AR 72221-3870
TELEPHONE    501-707-5547
FACSIMILE    501-421-5653
CELL         501-749-7000
deilbott@jacknelsonjones.com
COUNSEL
 JACK NELSON JONES
BEUS & CATLEDGE, P.A.

---

**From:** Adrienne L. Jung [mailto:AJung@wlj.com]
**Sent:** Friday, June 04, 2010 5:32 PM
**To:** Don Eilbott
**Cc:** Judy Simmons Henry
**Subject:** FW: Beech- strategy/joint defense
**Importance:** High

Don,

Would you mind sending me a separate email consenting to removal of this case as Judy mentioned below?  We're finalizing our removal pleadings now so we can file on Monday.

Thanks!


Adrienne L. Jung
Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
Main:  (501) 371-0808
Direct:  (501) 212-1225
FAX:    (501) 376-9442
www.wlj.com


WLJ
WRIGHT, LINDSEY
& JENNINGS LLP

3